COMMONWEALTH *vs.* J. THOMAS GETTIGAN.

Suffolk.   March 2, 1925. — May 22, 1925.

Present: RUGG, C.J., CROSBY, CARROLL, WAIT, & SANDERSON, JJ.

*Homicide. Evidence,* Presumptions and burden of proof, Of motive, To impeach witness, Relevancy and materiality, Competency, Of conviction, Telephone conversation. *Witness,* Impeachment, Cross-examination. *Practice, Criminal,* Exceptions, Inspection of grand jury records, New trial.

At the trial of an indictment charging the defendant with the murder by poison of his aunt who lived with him and his wife, there was evidence to show that, while others had an equal opportunity, the defendant had ample opportunity to administer poison to the deceased; that he had a motive in a desire to get control of her property; that he made frequent inquiries about her money and her financial condition, and inquired concerning the financial condition of the husband of his only other aunt; that he had stated after his aunt's death that, now that she was out of the way, if he could get rid of the husband of his other aunt he could get anything he wanted from the other aunt; and that he sought to conspire to that end.   There was no direct evidence to show that the defendant administered poison to the aunt who was murdered. A motion by the defendant for a verdict of not guilty was denied. He was found guilty of manslaughter.   *Held,* that on the circumstantial evidence the verdict was warranted and that the motion properly was denied.

At the trial of the indictment above described,

(1) A witness for the Commonwealth properly was permitted to describe in detail conversations with and conduct of the defendant in which he attempted to carry out a plan and conspiracy which had involved the murder of the first aunt and of the husband of the surviving aunt;

(2) A witness for the Commonwealth having testified that the defendant had stated to him, "now that his aunt was out of the way he could get anything he wanted from . . . [the surviving aunt] if . . . [her husband] was out of the way," and then having answered in the negative a further question, whether he had not stated before the trial in the district attorney's office that the defendant had said, "I got one of them out of the way and if I can get him . . . [the husband of the surviving aunt] out of the way I can get anything I want from the aunt," it was proper to admit evidence tending to show that the witness had made such earlier statement in the district attorney's office;

(3) It was proper to exclude a question, asked in cross-examination of a witness for the Commonwealth for the purpose of showing that the witness was the father of an illegitimate child, and that he "had been known" in police circles;

(4). It was proper to exclude questions, asked in cross-examination of a witness for the Commonwealth, relating to a conversation he had with a clerk of a district court and the police when a complaint was made against the defendant for soliciting the murder of the husband of the surviving aunt and inquiring whether any reference was made in that conversation to the death of the defendant's aunt by poisoning; and also a question, whether he procured a warrant;

(5) It was proper to exclude a question, asked in cross-examination of the same witness, seeking the reason why he did not arrange with the police to trap the defendant on a night when the defendant and he had planned that he should kill the husband of the surviving aunt;

(6) The record of a conviction of the defendant for embezzlement having been introduced, it was proper to exclude an alleged receipt for the amount of money he was accused of embezzling for the purposes of explaining the record and to show that the money had been given to the defendant and had not been embezzled by him;

(7) A police officer properly was not permitted to testify to a telephone conversation with some one whose voice he could not identify; and his notes of such conversation properly were excluded, as well as the fact that afterwards the officer stated to the defendant that he had located or thought he had located the source of the telephone call;

(8) Evidence tending to show whether the relations between the deceased and the surviving aunt were intimate and friendly or otherwise was competent;

(9) It was proper for the trial judge in the exercise of his discretion to exclude, in the cross-examination of the surviving aunt after she had testified that she was married a second time to her husband because they had lost their earlier marriage certificate, questions asked with a view to showing that there had been no earlier marriage;

(10) In the cross-examination of the surviving aunt, it was proper to exclude a question, whether it was strange and whether it was not natural for the defendant to ask about her family;

(11) It was proper to permit the surviving aunt to testify to a conversation with the defendant after her sister's death wherein he told her that they were the only ones left in the family and talked about her husband's wealth;

(12) There being no testimony introduced by the Commonwealth tending to show that a certain solution of arsenic was used to poison the defendant's aunt, it was proper, after the surviving aunt had testified that she never heard of that solution being used in the treatment of her husband for a malady from which he was suffering, to exclude a question, whether she would be surprised to hear that it was so used;

(13) In the discretion of the trial judge, it was proper to permit the surviving aunt to testify that she did not know any reason why the defendant should seek administration of her sister's estate when she, the witness, already had filed a petition for such administration;

(14) It was proper for the judge, in the exercise of his discretion, to permit the defendant to be asked questions in cross-examination which tended to show that only three persons besides himself had opportunity to poison his aunt, one of whom was the aunt who survived, and that in his opinion she did the poisoning;

(15) No error was shown in making in the charge to the jury certain quotations from the opinion in *Commonwealth* v. *Webster*, 5 Cush. 295.

A defendant indicted and tried for murder has no right as a matter of law, after the verdict and sentence, to have granted a motion by him to inspect the testimony and records of the grand jury for the purpose of contradicting witnesses for the Commonwealth at the trial, who previously had testified before the grand jury.

The disposition of a motion for a new trial of an indictment for murder for any of the causes permitted by statute lies in the sound discretion of the trial judge.

An exception to a denial of the motion for a new trial of an indictment for murder, based on allegations, supported by affidavits, of alleged newly discovered evidence, will not be sustained merely because the judge might have believed testimony set forth in affidavits supporting the motion.

No exception lies to a refusal by the trial judge, in the case above described, to approve a request by the defendant to the Federal War Department to inspect the war record of a material witness for the Commonwealth.

INDICTMENT, found and returned on February 11, 1922, charging the defendant with the murder of Lizzie M. Cook by poisoning.

There was a trial in the Superior Court before *Dubuque*, J. The questions, the exclusion of which was the subject of the seventh exception, were: "Q. Was there any reference at any of these [conversations with the clerk of the Chelsea District Court and the Revere police at the time when an application was made for a warrant as to the soliciting of the murder of Richardson] you had that Mrs. Cook had died from poisoning? Q. You didn't get a warrant for the first time you went to Chelsea?"

As to the fourteenth exception: Mrs. Richardson had testified that she was married to her husband "in Natchez, Mississippi, in 1904 and married him again in Nashua, New Hampshire, in 1910 because they had lost their earliest certificate." The following questions then were excluded: "Have you ever written down to get a copy of it? Now as a matter of fact isn't it true that you were not married in Natchez, Mississippi? Under what name were you married in Mississippi?"

As to the seventeenth exception: Mrs. Richardson had testified that she never heard of Fowler's solution being used in the treatment of her husband for tumor. The following

questions then were asked and excluded: "Q. He never had it [Fowler's solution]?　A. No. — Q. Would you be surprised to know that there was a time in connection with his treatment when Fowler's solution was used?"

Other material evidence and exceptions by the defendant are described in the opinion. The defendant was found guilty of manslaughter and alleged exceptions.

*R. Walsworth,* (*M. Gilbert* with him,) for the defendant.

*M. Caro,* Assistant District Attorney, for the Commonwealth.

CROSBY, J.　The defendant was indicted for the murder by poisoning of one Lizzie M. Cook.　The trial resulted in a verdict of guilty of manslaughter.　Before sentence, the defendant filed a motion to set aside the verdict upon the ground, among others therein stated, that it was against the evidence.　This motion, after hearing, was denied, and the defendant excepted.　Thereafter, the defendant filed a motion to set aside the verdict and for a new trial on the ground of newly discovered evidence.　Motions to amend the original motion were filed, and, in addition, several affidavits in support of these motions and the amendments thereto.　All the motions for a new trial on the ground of newly discovered evidence were denied and the defendant excepted.　The case is also before this court upon exceptions taken by the defendant at the trial to the admission and exclusion of evidence, to certain instructions to the jury, to the denial of the motion that the court approve a request of the defendant made to the Federal war department to furnish a copy of the record of service of one McDonald (a witness called by the Commonwealth at the trial), and to the refusal of the court to allow the defendant to inspect the records and notes of testimony of witnesses given before the grand jury.

Before considering the exceptions in detail it may be well to review, in a general way, the circumstances as they existed before and after the alleged crime was committed. Lizzie M. Cook, the decedent, had made her home with the defendant (who was her nephew) and his wife from April, 1921, until the time of her death on June 19, 1921.　The de-

fendant, his wife, and Mrs. Cook were the only members of the household, and they lived on the second floor of a three-family dwelling house in Revere, the first floor of which was occupied by a younger sister of the decedent (Mrs. Cassie F. Richardson) and her husband (Clinton W. Richardson). The Commonwealth contended that the defendant killed Mrs. Cook by administering to her arsenic during the month of June, 1921. The undisputed evidence is to the effect that for some time before her death she was in poor health and suffered from pernicious anemia. Previous to the death of Mrs. Cook the defendant was employed as manager of an amusement resort in Revere, owned by the Richardsons, where William B. Lindsay, a colored man, was employed as an "African Dodger."

At the trial it was contended by the Commonwealth, and evidence was introduced to show, that the defendant had conceived a plan or scheme to kill Mrs. Cook and Richardson in order eventually to obtain whatever property they might possess; that he believed himself to be the sole heir at law of both his aunts; that for about thirty-five years before June, 1920, he had not visited them or made known to them his existence; that upon finding them in Revere he went to work for Richardson at the amusement resort; that he inquired of Mrs. Richardson about her husband's wealth and about Mrs. Cook's money; that Mrs. Richardson visited her sister regularly while she was living with the defendant and his wife, and saw him there; that many times he asked about her sister's money and financial means. William Lindsay testified that he was an "African Dodger" and had worked for Richardson for ten years; that the defendant said to him one day, after Mrs. Cook died, that he wanted him to burn Hurley's property for $100 — Hurley being the owner of an amusement resort near the Richardsons'; that the next day the defendant told him to forget what he said about burning Hurley's place as "he had a better job with more money which was to kill Richardson, because he had $250,000, and now that his aunt was out of the way if he could get rid of Richardson he could get anything he wanted from Mrs. Richardson"; that the defendant told him there

were "various ways of killing by chloroform and knocking in the head"; that afterwards Lindsay told Richardson what the defendant had said; that the witness went to a detective agency on July 15, and met John P. McDonald, a detective in Revere; and that he brought the detective to the defendant.

Lindsay and McDonald both testified, in substance, that "on July 15 Lindsay took McDonald dressed as a bum to the store and introduced him to the defendant as the man who would kill Richardson for him; that the defendant said he wanted Richardson killed because he was worth two or three hundred thousand dollars and now that his aunt was out of the way he could get anything he wanted from Mrs. Richardson if Richardson was out of the way; that they talked over various ways of doing it; that the defendant suggested a Saturday night for Richardson would then have several hundred dollars in cash; that he offered to pay $800 and then $1,000 to McDonald to do the killing, but did not actually pay anything; that this conversation was repeated in the store a day or so later"; that it was finally decided to kill Richardson with a club or gun at Richardson's garage on Saturday night; that they wanted a gun for a "get-away"; that McDonald said he was too well known in police circles to procure a gun, so the defendant said he would get it, but did not, and on the North Shore Road by appointment at a designated place he gave $10 to Lindsay and asked him to buy the gun; that the defendant said he would be in the house when they came up to kill Richardson "and when Mrs. Richardson called out he would come down to lead any one who might come one way while McDonald would run the other and escape"; that neither Lindsay nor McDonald went to the garage, but the next day both went to the Chelsea Police Court and secured a warrant for the arrest of the defendant. The case was afterwards dismissed for want of prosecution.

Mrs. Richardson testified that she gave her sister $5 a week to pay for her board, but that she never paid anything to the Gettigans and did not know what Mrs. Cook did with the money; that on June 12, she was awakened by Mrs. Cook rapping on the floor of her room, which was directly over the

room of Mrs. Richardson; that later she went upstairs, and the defendant let her in; that her sister was groaning and said "she never felt this way before"; that Mrs. Gettigan gave her some water and she quieted down; that the defendant said they would take care of her if she called again; that she (Mrs. Richardson) went up once or twice every day to see her sister; that she worked at the "Dodger" evenings, returning after twelve o'clock and then went up to see her sister; that Mrs. Cook was weak but was about the house until the week before her death, which occurred on the afternoon of Sunday, June 19, 1921; that on the day before she died the defendant told Mrs. Richardson that he had called the undertaker; that on the same day the undertaker called Mrs. Richardson and she told him her sister was not dead and she would call him when needed; that after her sister died she did call him and he took charge of the body and of the funeral.

Mrs. Richardson further testified that following her sister's death the defendant told her to take out administration and he would assent to her appointment, which was done; that the estate showed $1,000 in cash and real estate of the value of $500; that the defendant left their employment the last of June after some trouble with her husband or with a "Dodger"; and that in July he went to work at the Economy Grocery Store; that she knew about the employment of McDonald (the detective) on July 15, and knew what he and Lindsay were doing; that she was upstairs with the Gettigans the night Lindsay and McDonald said Richardson was to be killed and saw the defendant in the bathroom shaving, that he "was up waiting for something." She further testified that as a result of the information she received she went to see the district attorney relative to having the sister's body exhumed and examined; that she secured his assent and paid all the charges connected therewith; that after learning that the defendant was trying to kill her husband she thought he might have done the same thing to her sister; that her husband died of a tumor in May, 1922.

There was evidence that the body of the deceased contained more than three grains of arsenic; that it was found

in substantially every portion of the body; that from the bladder there was taken one and one third ounces of urine in which there was more than one grain of arsenic; that, while she may have had pernicious anemia, she died from arsenical poisoning; that in "Blauds" pills which had been administered to her by her physician, there was a very small amount of arsenic, not more than one fortieth of a grain; that the taking of these pills would not account for the quantity of arsenic found; that the last dose administered was more than enough to kill, it was a very large dose, and, in the opinion of medical experts who testified, it was administered within forty-eight hours before her death; that it might have been given within ten hours before she died, or even at a shorter period of time; that the condition of the organs of the body indicated that arsenic had been administered for a week or more before death; that in the opinion of these experts the arsenic was administered in the form of Fowler's solution, a colorless liquid which has no taste or odor; that there is a similarity in the symptons of pernicious anemia and arsenical poisoning, but that in pernicious anemia death would not be sudden, and until the autopsy and chemical examinations it was not known that the deceased died from arsenical poisoning. The defendant did not contend that the quantity of arsenic found in the body of Mrs. Cook was due to the taking of "Blauds" pills. The evidence was sufficient to show that the death of the deceased was the result of arsenical poisoning, and we do not understand the defendant disputes that conclusion.

He testified in his own behalf, and denied that he ever administered any arsenic to the deceased, as contended by the Commonwealth. He testified that most, if not all, of the statements tending to show incriminating conduct on his part were false. The jury could have found that the deceased was a member of the household of the defendant and that he was with her frequently for a considerable period of time before her death; that he had ample opportunity to administer poison to the deceased, even if other persons had equal opportunity to commit the crime. There was also evidence tending to show a motive on the part of the

defendant to kill the deceased. It could have been found that he believed himself to be the sole heir at law of his aunts, Mrs. Cook and Mrs. Richardson, and that upon the death of the deceased and of Mrs. Richardson's husband he "could get anything he wanted from Mrs. Richardson." This evidence, together with the evidence that he had made frequent inquiries about Mrs. Cook's money and her financial condition and inquiry concerning the financial condition of Mr. Richardson, and the defendant's statement relating thereto, with the other evidence, was competent to show that he had a motive to commit the offence charged. *Commonwealth* v. *Howard*, 205 Mass. 128, 148. *Commonwealth* v. *Feci*, 235 Mass. 562, 566, 567. Although there was no direct evidence to show that the defendant administered poison to Mrs. Cook which resulted in her death, and the case of the Commonwealth depended wholly upon circumstantial evidence, it could not rightly have been ruled that there was no sufficient evidence to warrant a verdict of guilty of murder, or of the lesser offence of manslaughter. Accordingly the defendant's motion that a verdict be directed in his favor was rightly denied. The defendant's thirty-third exception is therefore overruled.

The several exceptions relating to the admission and exclusion of evidence taken during the trial will be considered in the order in which they arose.

The first is to the admission of an offer of proof made by the Commonwealth as to what Lindsay and McDonald would testify to, to the effect that the defendant endeavored to hire some one to kill Richardson. We are of opinion that, from this evidence, it could have been found the defendant had formed a plan or purpose to get rid of Mrs. Cook and Richardson; that after this had been accomplished he believed himself and Mrs. Richardson would be the only heirs of Mrs. Cook; and that after the death of Richardson he would be able to get from Mrs. Richardson whatever property her husband and Mrs. Cook left. If this evidence were believed it could have been found that the attempt to hire Lindsay or McDonald, or both, to kill Richardson, was part of a plan or scheme formed by the defendant before the death

of Mrs. Cook, to kill her also, so that he would be able to obtain her property as well as that which Richardson might have. If this offer of proof had been merely an offer to prove an entirely different and distinct crime, wholly disconnected from the offence with which the defendant was charged, it would have been inadmissible. But when, as in the case at bar, it could have been found that the defendant formed a plan to kill both the deceased and Richardson to accomplish a common end, namely, to obtain possession of the property of both, the fact that a distinct crime was committed did not render the evidence inadmissible. *Commonwealth* v. *Snell,* 189 Mass. 12, 21. If it be shown that a defendant, charged with the commission of a crime, has committed other offences the commission of which has a tendency to establish the act in controversy, such evidence is admissible. *Commonwealth* v. *Dow,* 217 Mass. 473, 480. *Commonwealth* v. *Feci, supra.* As the testimony of Lindsay and McDonald was properly admitted, the defendant's first exception must be overruled.

There was no error in admitting the evidence of conversations between the defendant and Lindsay; nor in admitting the testimony of the witness, William B. Wright, who read from his notes the statement of Lindsay to the effect that "He said I got one of them out of the way and if I can get him, Richardson, out of the way I can get anything I want from the aunt." Lindsay, in his direct examination having testified that the defendant said to him "now that his aunt was out of the way, he could get anything he wanted from Mrs. Richardson if Richardson was out of the way," was asked by the prosecuting officer if he had not stated before the first trial in the district attorney's office that the defendant said, "I got one of them out of the way and if I can get him, Richardson, out of the way I can get anything I want from the aunt." To this question the witness answered, "No, not in that way." In this state of the evidence the testimony of Wright was admissible. Evidence of inconsistent statements made at another time by a witness respecting the subject of his testimony is admissible under G. L. c. 233, § 23. The evidence of Wright was admissible for the purpose of contradicting Lindsay. *Commonwealth* v. *Moinehan,* 140

Mass. 463, 464. *Commonwealth* v. *Festo*, 251 Mass. 275. The second and third exceptions, accordingly, are overruled.

The fourth exception, to the exclusion of the question, on cross-examination, to the witness McDonald, must be overruled. It was within the discretion of the court to exclude it.

The fifth exception is also overruled: it was to a question put to the witness McDonald by the defendant on cross-examination, for the purpose of showing that the witness was the father of an illegitimate child; the question was rightly excluded, as it was not relevant to any issue involved in the trial.

The sixth exception is without merit: the inquiry whether McDonald had been known in police circles was immaterial.

The questions, asked in cross-examination of the witness McDonald, whether he had certain conversations with the clerk of the District Court in Chelsea, and with the chief of police when the warrant for the arrest of the defendant was applied for, or whether it was obtained, were immaterial. The seventh exception cannot be sustained.

The reason why McDonald did not arrange with the police to trap the defendant on the night it was planned to kill Richardson had no bearing upon the guilt or innocence of the defendant; accordingly the eighth exception is overruled.

The question to Hurley, whether he said anything to the defendant about the threat to burn his (Hurley's) place, does not appear to have any bearing upon any material issue. Accordingly the ninth exception must be overruled.

The defendant in his direct examination having testified to a conviction and sentence in Maine in 1914 for embezzlement, the Commonwealth introduced a certified copy of the record in that case showing the indictment, conviction, and sentence for the embezzlement of $500 from one Rollins; the defendant then offered in evidence a certified copy of a receipt for this amount from Rollins to him, for the purpose of explaining this criminal record, and to show a gift of the money to him. The receipt was rightly excluded. The record was conclusive evidence of the conviction and could not be controlled or explained by the receipt. The tenth exception is therefore overruled. *Commonwealth* v. *Gallagher*,

126 Mass. 54, 56. *Commonwealth* v. *Galligan,* 155 Mass. 54, 56.

The eleventh exception relates to a telephone conversation which the defendant alleges one Tappan, a police officer, had with the witness Lindsay. The defendant was asked by his counsel: "Sometime later did Captain Tappan report to you that he had located or thought he had where the telephone call came from?" This evidence was plainly incompetent. What the officer thought as to where the call came from was at most only a matter of opinion of the officer. Besides, to admit what he told the defendant would be mere hearsay. *Warren* v. *Nichols,* 6 Met. 261, 264. *McDonald* v. *New York Central & Hudson River Railroad,* 186 Mass. 474, 477, 478. The officer, Tappan, above referred to, testified that he was at the Economy store where the defendant was employed, at six o'clock on October 11, 1921, and had a telephone conversation; he was then asked in direct examination: "I will ask now, what that was?" The defendant then offered in evidence the memorandum of the conversation; and also offered to show from the witness that the latter had a conversation with some one on the telephone about six o'clock in the evening, and that the voice at the other end of the line sounded like that of a colored man. It is plain that the memorandum was rightly excluded. The question remains whether the conversation was admissible. That depends upon whether the person at the other end of the line with whom Tappan talked was identified as Lindsay. Tappan did not know Lindsay at that time, and upon Tappan's testimony alone there was no evidence that the conversation which he had was with Lindsay. *Lord Electric Co.* v. *Morrill,* 178 Mass. 304. *Commonwealth* v. *Wakelin,* 230 Mass. 567, 574. *Jamaica Pond Garage, Inc.* v. *Woodside Motor Livery, Inc.* 236 Mass. 541. The fact that the person who called up the store purported to be Lindsay is not sufficient. Wigmore, Ev. (2d ed.) § 2155. While the record recites that the defendant testified that "Lindsay telephoned and the defendant gave the telephone to Captain Tappan who carried on the entire conversation," it also appears from the record that the defendant did not so testify until after the

telephone conversation had been offered and excluded. There is nothing to show that after defendant had so testified the defendant again offered the telephone conversation in evidence. In these circumstances the ruling that the conversation was inadmissible stood. We need not decide in the absence of such offer whether the conversation would have been admissible. It is enough to say that as there was no identification of the person at the other end of the line at the time when the evidence was offered, the offer of proof and question were rightly excluded. It follows that the eleventh and twelfth exceptions must be overruled.

It was competent for the Commonwealth to show the relations which existed between Mrs. Richardson and the deceased, whether they were intimate and friendly or otherwise. Accordingly the thirteenth exception is without merit.

The exclusion of questions put to Mrs. Richardson in cross-examination by the defendant to show that she was not married to her husband in Mississippi in 1904, was not error. The limitation of such cross-examination was in the sound discretion of the presiding judge. The fourteenth exception is overruled.

The questions on cross-examination of the same witness, whether it was strange and whether it was not natural for the defendant to ask about her family, were rightly excluded. The fifteenth exception, therefore, must be overruled.

No reversible error is shown, as claimed in the sixteenth exception, to questions put to Mrs. Richardson respecting a conversation had by her with the defendant, after the death of Mrs. Cook, in which Mrs. Richardson testified that the defendant told her that they were the only ones left of the family, and that he talked about her husband's wealth. Whether Mrs. Richardson would be expected to know that there had been a time in connection with her husband's treatment when Fowler's solution was used, was not material. Besides, there was no evidence to show that such solution was in fact so used. The seventeenth exception is overruled.

The exclusion of questions asked Mrs. Richardson in cross-examination by the defendant, which are the subject of the eighteenth, nineteenth, twentieth, twenty-first, twenty-

second and twenty-fourth exceptions and the exclusion of the probate records in the estate of Clinton W. Richardson, were not erroneous. These could have been found by the presiding judge to relate to collateral matters, or were immaterial to any issue involved.

The admission of questions to Mrs. Richardson on direct examination and her answers thereto, referred to in the twenty-third exception, seems to have but little if any bearing upon any issue. Their admission was not, however, prejudicial to the defendant.

The testimony of Mrs. Richardson that she did not know any reason why the defendant should seek administration of her sister's estate when she, the witness, had already filed a petition for such administration, was admissible in the discretion of the court. The twenty-fifth exception to the admission of this testimony is overruled.

The testimony of Miss Riley and Mrs. Richardson, called by the Commonwealth in rebuttal, was relevant and therefore admissible. Accordingly the twenty-seventh, twenty-eighth and twenty-ninth exceptions must be overruled.

The defendant excepted to a series of questions put to him on cross-examination in answer to which he stated in substance that there were only three persons, exclusive of himself, who cared for Mrs. Cook during the week preceding her death, namely, Miss Riley, Mrs. Richardson, and his wife. He further testified that he did not know who administered arsenic to the deceased, but in his opinion it was so administered by Mrs. Richardson. They were competent to be considered by the jury, who could have found that the defendant was attempting to escape responsibility for the death of the deceased, by falsely charging Mrs. Richardson with the crime. They were also admissible to enable the jury to judge of the degree of confidence to be given to his testimony. *Hathaway* v. *Crocker,* 7 Met. 262. Besides, in cross-examination of an adverse party great latitude of inquiry is allowed. Its extent is to be governed by the sound discretion of the court. *Jennings* v. *Rooney,* 183 Mass. 577, 579. *Commonwealth* v. *Phelps,* 210 Mass. 109. It follows that the thirtieth exception must be overruled.

The defendant excepted to certain portions of the charge. He complains that allusions to the evidence against the defendant were unfairly and inaccurately stated. A careful examination of the charge shows that these exceptions are untenable. The contention that references in the charge to conscious guilt were erroneous; that the law as stated, relating to the presumption of innocence, the burden of proof and reasonable doubt was inaccurate, incompetent and prejudicial to the defendant, cannot be sustained. The instructions were in accordance with well established principles; they were accurate and sufficient.

No extended reference need be made to the defendant's objection to quotations in the charge from the opinion in the leading case of *Commonwealth* v. *Webster*, 5 Cush. 295. The principles of law as enunciated in that case have been recognized and applied in this Commonwealth in numerous cases during the seventy-five years that have elapsed since that judgment was rendered. As we discover no error in the charge, the thirty-first exception is overruled.

After verdict and sentence, the defendant filed a motion to inspect the testimony and records of the grand jury for the purpose of contradicting witnesses for the Commonwealth who had testified before the grand jury. This motion was rightly denied. The defendant in a criminal case has no right to require the production of such testimony. *Commonwealth* v. *Goldberg*, 212 Mass. 88. Accordingly the thirty-second exception is overruled.

The thirty-third and thirty-fourth exceptions are to the denial of motions for a new trial on the ground that the verdict was against the evidence and also because of newly discovered evidence. Whether these motions or either of them should have been granted was a matter within the sound judicial discretion of the presiding judge, to the exercise of which no exception lies. We are unable to find that there was an abuse of that discretion. *Commonwealth* v. *Edgerton*, 200 Mass. 318, 327. *Commonwealth* v. *Turner*, 224 Mass. 229, 238. Although many affidavits were presented to the presiding judge in support of the motion for a new trial on the ground of newly discovered evidence, he may have be-

lieved that the statements therein were false, or, if true, that they would not have changed the result reached by the jury. *Commonwealth* v. *Borasky,* 214 Mass. 313, 322, and cases there cited.   *Commonwealth* v. *Russ,* 232 Mass. 58, 83.

The thirty-fifth exception is to the refusal of the court to approve a request of the defendant to the Federal War Department to inspect the war record of McDonald, a witness called by the Commonwealth, hereinbefore referred to. The trial judge was not required to approve the request, and if it had been so approved the department was not required to honor it.   No exception lies to such refusal.

The defendant appealed from the orders and rulings of the court in denying the motions for a new trial.   The ground of appeal as stated in the motion is that the action of the court in denying the motion was an abuse of judicial discretion.   That contention cannot be sustained.

After careful examination of the record, we are unable to discover any error of law.

> *Order denying motions affirmed.*
> *Exceptions overruled.*