COMMONWEALTH *vs.* CHARLES E. KENDRICK, JR.

Barnstable.     April 5, 1966. — June 24, 1966.

Present: WILKINS, C.J., SPALDING, CUTTER, KIRK, & SPIEGEL, JJ.

*Homicide. Evidence,* Of identity, Relevancy and materiality. *Practice, Criminal,* Capital case.

At a murder trial where there was evidence that the defendant, having on his person a large knife, went to the victim's home to discuss personal matters with him, was unexpectedly assaulted by the victim by means of a heavy poker, and thereupon stabbed the victim several times with the knife and killed him, and the issue of manslaughter was raised on the ground of use of excessive force in self-defence and also on the ground of a killing in hot anger aroused by the assault on the defendant, there was reversible error in that the judge, whose charge on the matter of self-defence required the jury to accept it wholly or to reject it wholly, ruled that it was not open to the jury to find manslaughter and refused to instruct the jury as to manslaughter. [212–213]

There was no error at a criminal trial in the admission of testimony by a man's neighbor familiar with the man's voice that the neighbor heard but did not see him shout a certain remark at his wife. [213]

At the trial of an indictment for murder of a victim killed by the defend-
ant in an affray between them, the defendant's judgment of the morality
of his relations with the victim's wife was wholly irrelevant.  [213]

On review of a capital case under G. L. c. 278, § 33E, as amended by
St. 1962, c. 453, this court, having determined that a verdict of murder
in the second degree was warranted but that there had been error in
withdrawing the issue of manslaughter from the jury, declined to order
entry of a verdict for manslaughter and sentence for that offence, and
reversed the judgment, set aside the verdict and remanded the case to
the Superior Court for a new trial on so much of the indictment as
charged murder in the second degree.  [213]

INDICTMENT found and returned in the Superior Court on
October 6, 1964.

The case was tried before *Bolster, J.*

*F. Lee Bailey* for the defendant.

*L. Barry Tinkoff,* Assistant District Attorney, for the
Commonwealth.

KIRK, J.    The defendant was convicted of murder in the
second degree on an indictment which charged him with the
murder of Thomas D. Giangreco at Barnstable on Septem-
ber 20, 1964.   The case is here on his appeal under G. L.
c. 278, §§ 33A–33G.

The judge, after a full hearing at the outset of the trial,
denied the defendant's motion to suppress certain state-
ments made by the defendant to the police.    Although the
denial was among the assigned errors, it was not mentioned
in his brief or in oral argument.    Rule 13 of the Rules for
the Regulation of Practice before the Full Court, 345 Mass.
787.

Of the three assignments of error which have been ar-
gued, the principal one relates to the judge's ruling that a
verdict of manslaughter could not be returned by the jury,
and to his refusal to instruct the jury on the law of homi-
cide as it pertains to manslaughter.    The issue presented is
whether, on the evidence, the jury were precluded as mat-
ter of law from finding the defendant guilty of manslaugh-
ter.    The principles of law are settled and well understood.
The application of them, however, sometimes requires, as
here, consideration in detail of the evidence bearing on the
issue.    *Commonwealth* v. *Gricus,* 317 Mass. 403, 413.    Most

of the evidence now to be stated originated with the defendant, either as statements to the police or as testimony by him at the trial.

The defendant was forty-four years of age, married, and the father of three children. He was employed as a rural mail carrier in Dennisport on Cape Cod. With his family he lived in Dennisport as the terms of his employment required. Commencing in May, 1963, an amorous relationship developed between the defendant and Mrs. Giangreco, who lived with her husband, the deceased, in Centerville. The defendant had known Mrs. Giangreco since she was three or four years old; or at least since grammar school. During the spring of 1963 he visited her daily, usually in the morning, after her husband had gone to work. On these occasions he did not park his car in front of the Giangreco house, but in a road or driveway near by. Together, they took frequent rides in her husband's car. The defendant was admittedly the father of a child born to Mrs. Giangreco in June, 1964.

The deceased, Thomas Giangreco, was sixty years old. He owned and operated, on a seasonal basis, a small restaurant in Hyannisport. The defendant and the deceased had known one another since 1956. They had played golf together but were not close friends. The intimacy between the defendant and Mrs. Giangreco was known to the defendant's wife, and to many people in the community. The deceased did not suspect the infidelity of his wife, if indeed he ever suspected it, until two weeks before his death. If he had then suspected it, he gave no indication of it to the defendant when they once met in the interval. There had never been an argument between the defendant and the deceased. The defendant had never talked with the deceased about his relations with Mrs. Giangreco or about the baby.

For about a year prior to the fatal event the defendant had planned to get a divorce. He hoped that the deceased would permit Mrs. Giangreco to get a divorce so that he and Mrs. Giangreco could marry. As a step in the execution of the plan, the defendant on September 13, 1964, hired

a cottage in Dennisport where Mrs. Giangreco and the baby were to live. During the following week, he stocked the cottage with food. On Sunday morning, September 20, 1964, he took Mrs. Giangreco and the baby, and many personal effects, including the crib, to the Dennisport cottage. In the cupboard were placed three cups, bearing the names Charles, Ruth, and Robert, the names, respectively, of the defendant, Mrs. Giangreco and the infant. Following a tour of the Cape, including a stop where the two adults played miniature golf, the party returned in the early evening to Centerville where the defendant dropped off Mrs. Giangreco and the baby at their residence. The defendant left for Hyannis. It was the defendant's purpose to go back to Centerville later in the evening and discuss with Giangreco in the presence of Mrs. Giangreco the prospect of the latter getting a divorce. He did go back and he drove past the Giangreco house several times wondering just how he would "break the news" to Tom. He was attired then, as he had been all day, in Bermuda shorts, a shirt, and rubber soled canvas shoes.

About 8:45 P.M. the defendant parked his motor vehicle at a place nearby, and took from it and put in his pocket or belt a German army knife and scabbard which he had brought home from Germany as a souvenir of his service in World War II as an infantry platoon sergeant. The blade of the knife, of Solingen steel, was seven and one-half inches long and, at the hilt, almost an inch wide. It had one keen edge and came to a point at the tip of the blade. The handle was slotted to make the weapon adaptable for use as a short bayonet. The defendant used his motor vehicle in his duties as a rural mail carrier. The car had a folding sign on the top identifying its use. The knife, as the Commonwealth conceded, had always been kept in the defendant's car, and was used by the defendant to cut bundles of mail. The defendant took the knife with him as he went to the Giangreco house because he thought there might be trouble with Tom when he brought up the subject of Tom's wife and the baby, and because he wanted to pro-

tect Mrs. Giangreco and the baby if Tom "got mad." He had seen Tom "get mad" with people on other occasions. Tom had "quite a temper."

The defendant went to the front door of the Giangreco dwelling. Although darkness had descended, the area in front of the house was sufficiently lighted by a nearby street light to permit recognition of persons. The front door is in a recessed area or alcove. The defendant knocked at the door and waited for an answer. When no answer came, he walked along the front of the house and looked in the windows. Through one window he saw the deceased, seated at the kitchen table, wearing a bathrobe and working on some papers. The defendant leaned over the bushes near the house, tapped on the window, and called out loudly, "Tom, will you let me in?" While the defendant was leaning forward, the light from the kitchen fell on his face. Tom looked directly at him, got up from the table and went into the living room. The defendant returned to the front door which was locked, and faced it, expecting the deceased to open it. He knew that the door opened inward. He soon heard footsteps behind him. He turned in the alcove and saw Tom with a fireplace poker in his right hand and a flashlight in his left hand. While the defendant was still in the alcove, Tom raised the poker and struck the defendant on the shoulder. The defendant said, "What's the matter with you, Tom?" The deceased answered, "I will show you what's the matter with me," and struck at him again with the poker. The defendant partly deflected the blow with his left arm, but he was hit on the nose. The defendant tried to hold off the deceased with his fists; he tried to grapple with him with his hands and could not; he then pulled his knife and said, "[S]tay away from me." The deceased advanced again, and the next thing the defendant knew, the deceased was on the ground. He could not recall stabbing the deceased, or the number of times he stabbed him.

Giangreco was dead upon the arrival of the police in response to a telephone call at 9:01 P.M. from Mrs. Giangreco

who reported that there had been a fight outside her house. The deceased was lying near some bushes along the foundation of the house at a point at least fifteen feet from the front door area. A fireplace poker protruded from under his right arm. A flashlight was five feet away from the body. The cause of death was stab wounds in the neck and chest. Some of the wounds were three inches deep and were obviously inflicted with plunging force rather than as slashes with the edge of the blade. There was a complete severance of the left vertebral artery. The deceased's left hand was cut. There were also some relatively superficial wounds and abrasions on his body.

The defendant had left the scene immediately. He threw away the knife and scabbard, which were later recovered with his help. He went to the Dennisport cottage where he washed and attempted to dress his "wounds." He then went to a public telephone and called the Giangreco house. A police officer answered. The defendant asked for Tom and was told that Tom was busy. The defendant then returned to his own home where at 12:50 A.M. on September 21, 1964, the police, who in the interim had questioned two other rural mail carriers, interviewed him. The defendant told the police that he had played golf with a friend on September 20. In response to an inquiry whether the injuries to his face were caused by having been hit with a club, he explained that his face had been scratched by the bushes while playing golf. A telephone call by the police, made in the defendant's presence, to the man with whom he said he had played golf, disclosed that the man had been out of the State on September 20. At this point, the defendant was told by the police that he was suspected of a serious crime, that he did not have to answer any questions, but that if he did answer, the answers could be used against him, and that if he wanted a lawyer he could get one. The defendant replied that he did not need a lawyer, that he had done nothing wrong. He then gave the narrative as heretofore stated. At 2:45 A.M. the defendant told his lawyer that he had been in a fight, that the fellow had died, and that he was going to plead self-defence.

Commonwealth *v.* Kendrick.

A physician who examined the defendant on September 22 reported that he had four "skin wounds" on his lips and cheek, a swelling over the bridge of his nose, a "wound" back of the shoulder blade and a sixteenth of an inch "wound" or "hole" on his left thigh.

The poker found at the scene was, according to police testimony, part of the Giangreco fireplace set. It was a heavy forged steel poker, twenty-five inches long, with a crescent-shaped hook two inches from the end of the shaft. Obviously, and as the police testified, it was a "dangerous weapon."

The record gives no indication of the size, strength and agility of the deceased as compared to the defendant whom the jury observed. The defendant testified on both direct and cross-examination that he had engaged in knife fighting while on night patrols into the German lines during the war.

We now turn to the charge. In so far as the indictment charged murder in the first degree, the judge eliminated the element of deliberately premeditated malice aforethought as well as the element of the commission or attempted commission of a crime punishable with death or life imprisonment.[1] G. L. c. 265, § 1. He left the element of extreme atrocity or cruelty to the determination of the jury. The judge instructed the jury on the law pertaining to self-defence. He then told the jury, however, that there was "no evidence to warrant a verdict of manslaughter in this case."

Prefatory to our discussion of this ruling, it should be said that there was ample evidence to support the verdict returned by the jury. Accordingly, we direct our attention to the correctness of the judge's decision to withdraw the issue of manslaughter from the consideration of the jury. The number and nature of the wounds inflicted on Giangreco establish that the killing was intentional. When the killing is caused by the intentional use of a deadly weapon, there arises the presumption of malice aforethought, as

---

[1] The prosecution unsuccessfully tried to prove that the defendant killed Giangreco in an attempt to rob him of money.

that term has long been understood and applied in this Commonwealth. *Commonwealth* v. *York,* 9 Met. 93, 104. *Commonwealth* v. *Webster,* 5 Cush. 295, 305. *Commonwealth* v. *Young,* 326 Mass. 597, 600–601, and cases cited. The circumstances which attended the killing may, however, be shown to rebut the presumption of malice. This may be done by a showing that the homicide was committed in self-defence and was therefore excusable, or by a showing of circumstances which although they would not excuse or justify the act would mitigate the crime from murder to manslaughter. It is the last proposition which primarily concerns us.

Hovering over the case are the admitted facts that the defendant armed himself with a deadly weapon and went, unbidden, to the deceased's house for the purpose of discussing with him a subject which the defendant knew would arouse Giangreco's strongest emotions and might produce violence. On the other hand, there is the countervailing circumstance, if the jury believed the defendant, that the confrontation and the mortal affray occurred before the defendant had an opportunity to mention the subject which he feared would provoke Giangreco to anger. Another circumstance which the jury could find was that a meeting of the two men in the Giangreco household was planned by the defendant but was neither sought nor expected by the deceased. They could find, however, that the actual place of the confrontation was a surprise to both. Giangreco had last seen the defendant, if indeed he had recognized him, at the kitchen window. He had no reason to suppose that the defendant had a knife in his pocket or belt. The defendant, on his part, expected Giangreco to meet him by opening the front door, unarmed. Instead, it could be found, Giangreco armed himself with the poker, left the house by the back door, and came around the end of the house to the front lawn. On the defendant's version, the clash in the recessed area of the front door could be found to have been a sudden combat in which the deceased was initially the aggressor. *Commonwealth* v. *Baker,* 346 Mass. 107, 117,

119. If the deceased initiated the assault with the poker while the defendant was cornered in the areaway of the door so that the defendant in fact feared and reasonably feared that he was in danger of being killed or suffering grievous bodily harm at the hands of Giangreco, he had the right to use whatever means were reasonably necessary to avert the threatened harm. *Commonwealth* v. *Woodward,* 102 Mass. 155, 161–162. "In order to create a right to defend oneself with a dangerous weapon likely to cause serious injury or death, it must appear that the person using the weapon had a reasonable apprehension of great bodily harm and a reasonable belief that no other means would suffice to prevent such harm." *Commonwealth* v. *Houston,* 332 Mass. 687, 690, and cases cited. If the jury found that the circumstances immediately preceding and attending the killing created in the defendant the right to use the deadly weapon to defend himself against Giangreco, the homicide was excusable and the defendant was entitled to a verdict of not guilty. In substance the judge so instructed the jury. His instructions were correct as far as they went. The jury, however, should have been instructed further, upon the assumption that the deceased was the original assailant, that if the use of the knife by the defendant as a means of averting harm to himself was unreasonable and clearly excessive in light of the existing circumstances, they could conclude that the defendant himself became the attacker and, since death resulted from his use of excessive force, he would be guilty of manslaughter. "Ordinarily the question how far a party may properly go in self defence is a question for the jury, not to be judged of very nicely, but with due regard to the infirmity of human impulses and passions." *Monize* v. *Bagaso,* 190 Mass. 87, 89, quoted in *Commonwealth* v. *Houston,* 332 Mass. 687, 690. The judge's charge left it to the jury to accept wholly or to reject wholly self-defence as an excuse for the killing. We think that the legal consequence of using manifestly disproportionate violence in the supposed exercise of the right of self-defence should likewise have been made known to the jury.

In passing upon the reasonableness of the force used by the defendant, again on the hypothesis that he was acting in self-defence, the jury should consider evidence of the relative physical capabilities of the combatants, the characteristics of the weapons used, and the availability of maneuver room in, or means of escape from, the doorway area. In addition, the distance from the doorway to the spot where the deceased's body was found could be a significant factor in determining who was doing the attacking when the deceased was felled.

Indeed, the place where the body was found might well be of significance in determining whether the defendant had the right of self-defence at all. If in fact the confrontation and fight took place on the front lawn where the body was found, the right of self-defence might not be available to the defendant, since it might then appear that the defendant had a clear field to escape before delivering the lethal blows. The right of self-defence does not accrue to a person until he has availed all proper means to avoid physical combat. *Commonwealth* v. *Peterson,* 257 Mass. 473, 478. *Commonwealth* v. *Trippi,* 268 Mass. 227. *Commonwealth* v. *Hartford,* 346 Mass. 482, 490. The right of self-defence arises from necessity, and ends when the necessity ends.

The issue of manslaughter was also open for consideration by the jury on other grounds if the evidence is viewed, as the jury could view it, in another aspect. If the jury should find that the encounter did take place on the front lawn rather than at the doorway and that the deceased struck the first blow which roused the defendant to the heat of passion and that, while thus stirred to anger, he retaliated "with a weapon likely to endanger life, and death ensues, it is regarded as done through heat of blood or violence of anger, and not through malice," with the result that the homicide is unlawful but, the element of malice being missing, the crime is mitigated from murder to manslaughter. *Commonwealth* v. *Webster,* 5 Cush. 295, 307–308. *Commonwealth* v. *Young,* 326 Mass. 597, 601.

Our conclusion is that the issue of manslaughter should

not have been foreclosed and that there was error in not giving to the jury instructions relating to that offence.

We comment on the other argued assignments of error. The judge refused to strike the testimony of a neighbor of the Giangrecos that she heard but did not see Tom shout at his wife who was on the piazza, "How long you getting away with this?" The occasion was two weeks before Giangreco's death, just after he came home and as the defendant was trotting out of the house. The motion was on the ground that the witness had not heard Giangreco shout before. The assignment is frivolous. The witness was familiar with the voice of the deceased from conversation with him. There were, in addition, other confirming circumstances that pointed to Giangreco as the one who shouted. *Commonwealth* v. *Hartford,* 346 Mass. 482, 488. There was no error in refusing to strike the testimony.

The remaining assignment relates to the persistent but unsuccessful efforts of the prosecution to have the defendant express a judgment on the morality of his association with Mrs. Giangreco. The inquiries were wholly irrelevant to the charge laid in the indictment. They should not have been made and doubtless will not be made at another trial.

The defendant has suggested that, under the power given to us by G. L. c. 278, § 33E, as amended by St. 1962, c. 453, we direct the entry of a verdict of manslaughter and remand the case to the Superior Court for the imposition of sentence, as was done in *Commonwealth* v. *Baker,* 346 Mass. 107, 119. We decline to do so. As we have already stated, our concern has not been with the propriety of the verdict returned by the jury, but with the impropriety of withdrawing from their consideration another verdict which, although they might not have reached it, was nevertheless open to them upon the evidence. Having given consideration to the whole case, as required by G. L. c. 278, § 33E, as amended, we are of opinion that justice requires a new trial on so much of the indictment as charges murder in the second degree.

Since there must be a new trial and since the defendant

has not made any argument to us on the judge's ruling on the motion to suppress evidence, we do not consider the applicability, if any, of *Miranda* v. *Arizona*, 384 U. S. 436.

<div align="right">

*Judgment reversed.*

*Verdict set aside.*