COMMONWEALTH *vs.* CHARLES M. PIMENTAL.

Bristol.    May 9, 1977. — June 28, 1977.

Present: HALE, C.J., GRANT, & BROWN, JJ.

*Practice, Criminal,* Directed verdict, Access to witnesses, Disclosure of evidence before grand jury. *Self-Defense. Evidence,* Contradiction of witness, Conflicting statements of witness, Relevancy and materiality, Of reputation.

Evidence at a murder trial that the victim and the defendant engaged in a fight on a city sidewalk, that the defendant stabbed the victim four times with a knife after the victim slashed at him with a razor, and that the defendant immediately fled the scene was sufficient to warrant findings that the defendant had used more force in defending himself than was reasonably necessary in the circumstances and that the killing was intentional. [464-465]

At a murder trial admission in evidence, pursuant to G. L. c. 233, § 23, of a witness's out-of-court statement describing a fight between the defendant and the victim was reversible error, where inadmis-

---

sible portions of the statement went to the critical issue of who had been the aggressor and where there was genuine doubt whether the jury comprehended the import of the judge's limiting instructions given at later stages in the trial. [465-468]

INDICTMENT found and returned in the Superior Court on October 4, 1972.

The case was tried before *Tamburello, J.*

*Edward Miron Dangel (George T. Bolger* with him) for the defendant.

*Lance J. Garth,* Assistant District Attorney (*Mary A. McLaughlin* with him) for the Commonwealth.

GRANT, J.  The defendant was indicted for the murder of Robert E. Pichette in Fall River on September 11, 1972. He had admitted to the police that he had killed Pichette, but he had told the police, and he claimed and testified at trial, that he had acted in self-defense. The trial judge directed a verdict for the defendant on so much of the indictment as alleged murder in the first degree and submitted the case to the jury on murder in the second degree and manslaughter. The jury convicted the defendant of manslaughter. The case was taken, and the defendant's appeal is here, under G. L. c. 278, §§ 33A-33G.[1]

1. There was no error in the denial of the defendant's motion for a directed verdict presented at the close of the Commonwealth's case (see *Commonwealth* v. *Kelley,* 370 Mass. 147, 149-151 [1976]) because the Commonwealth had by that time sustained its burden of introducing evidence sufficient to warrant a finding that the defendant had not acted in self-defense (*Commonwealth* v. *Rodriguez,* 370 Mass. 684, 688-689 [1976]). There was properly admitted evidence from which it could have been found that the defendant and Pichette had been engaged in a conversation concerning the possible purchase of barbiturates from Pichette while the defendant was seated in the right front seat of a parked car and Pichette was standing on the ad-

---

[1] The appeal appears to have been delayed by motions for a new trial which are of no present concern.

jacent sidewalk, that Pichette had kicked the defendant twice through the open (and only operable) door of the car, that the defendant had gotten out of the car and engaged in a fight with Pichette, that Pichette had slashed at the defendant with a razor,[2] that the defendant had sustained a slash on his left hand, that he had stabbed Pichette four times with a knife (see *Commonwealth* v. *Reddick,* 372 Mass. 460, 462 [1977]), including once through the heart and lungs (the mortal wound) and once in the side of the left buttock, and that the defendant had immediately fled the scene (see *Commonwealth* v. *Montecalvo,* 367 Mass. 46, 52 [1975]; *Commonwealth* v. *Gilday,* 367 Mass. 474, 496 [1975]), leaving Pichette lying on the sidewalk in a dying condition. On that evidence it was open to the jury to find that the defendant had used more force in defending himself than was reasonably necessary in the circumstances and that the killing had been intentional. See *Commonwealth* v. *Houston,* 332 Mass. 687, 690 (1955); *Commonwealth* v. *Kendrick,* 351 Mass. 203, 209-211 (1966); *Commonwealth* v. *Binnette,* 351 Mass. 704 (1966). The fight took place on a city sidewalk, and there was also a question for the jury whether the defendant had a clear field to escape before delivering the mortal wound. See *Commonwealth* v. *Kendrick,* 351 Mass. at 212; *Commonwealth* v. *Shaffer,* 2 Mass. App. Ct. 658, 660-662 (1974), *S.C.* 367 Mass. 508, 511, 512 (1975); *Commonwealth* v. *Gagne,* 367 Mass. 519, 524-525 (1975).

2. Six days following the incident already described one Patricia Lajoie (then Jalbert) gave the Fall River police a signed statement, the body of which is set out in the margin.[3] The prosecutor called Lajoie as his second witness.

---

[2] The evidence as to Pichette's use of a razor came in the form of statements the defendant had voluntarily made to the police while in the presence of his lawyer and parents. See *Commonwealth* v. *Houston,* 332 Mass. 687, 690-691 (1955).

[3] "At about 8:30 P.M., on Monday, September 11, 1972, I (Patricia Jalbert) was standing on the corner of Pleasant and Quequechan Streets when I noticed JoAnn Dorsey parking her auto on Quequechan

She immediately testified to the effect that she had not seen the fight and had been elsewhere on the evening in question. When confronted with the statement, she admitted having given it and identified her signature thereon but testified that she had been under the influence of drugs when she had given the statement and that she had no present recollection of what she had told the police or of anything that might appear in the statement. See *Commonwealth* v. *Chin Kee*, 283 Mass. 248, 261 (1933); *Commonwealth* v. *Festa*, 369 Mass. 419, 425-426 (1976); *Commonwealth* v. *Reddick*, 372 Mass. at 462-463. The prosecutor made no effort to use the statement to refresh the witness's recollection (see *Commonwealth* v. *Hartford*, 346 Mass. 482, 486-487 [1963]); instead, he requested a ruling to the effect that the witness was hostile (see *Commonwealth* v. *White*, 367 Mass. 280, 281-284 [1975]; *Commonwealth* v. *Reddick*, 372 Mass. at 462-463). The judge took no action on that request but inquired of the witness whether the statement was "different from" what she had said in court. Upon receiving an answer in the affirmative, the judge advised counsel at the bench that he would admit the statement in evidence under the provisions of G. L. c. 233, § 23[4] (see *Commonwealth* v. *Festo*, 251 Mass. 275,

Street near the side door of the Pleasant Cafe. Seated on the passengers side of JoAnn's auto was Charles Pimental.

"I saw Charles Pimental leave this auto and enter the Pleasant Cafe. A few minutes later Charles Pimental and Robert Pichette came out of the front entrance. Charles Pimental wanted 10 reds from Robert Pichette. Robert Pichette said no. Then Charles Pimental said I want them. Robert Pichette then said, 'if you got the five dollars I'll give them to you.' Charles Pimental said again, 'I want them.' Robert Pichette replied, 'F--- you.' Charles Pimental then started punching Robert Pichette. Robert Pichette then took off his jacket and was knocked to the sidewalk, his jacket falling between his legs.

"Then I saw Charles Pimental with a small knife in his right hand. He jumped on Pichette, who was laying on the sidewalk and I saw Pimental stab Robert Pichette four times in the chest. Then I saw Charles Pimental get into JoAnn's car. He started waving the knife in his right hand saying if anybody goes to the cops I'll kill you."

[4] "The party who produces a witness shall not impeach his credit by evidence of bad character, but may contradict him by other evidence, and may also prove that he has made at other times statements inconsistent with his present testimony; but before proof of such inconsistent

278-279 [1925]; *Commonwealth* v. *Gettigan,* 252 Mass. 450, 459 [1925]; *Commonwealth* v. *LaFrance,* 361 Mass. 53, 57 [1972]) and would instruct the jury during the course of his charge as to the limited purpose for which the statement might be considered by them. Counsel for the defendant specifically objected on the ground that nothing in the statement was inconsistent with the witness's testimony on the stand.

Following testimony by the police officer to whom the statement had been given and by the notary public who had taken the witness's oath to the truth of the statement and witnessed her signature thereon, the statement was admitted in evidence and marked as an exhibit, all subject to exceptions properly saved by the defendant. No limiting instruction was given at that time. The witness Lajoie, who then returned to the stand, was not questioned further as to the contents of the statement or as to the events of the night in question, although she was cross examined as to her mental condition at the time she had given the statement. At the conclusion of her testimony the judge advised the jury that he would instruct them in his charge that the "inconsistent" statement did not have the effect of independent evidence and had no probative force with respect to the truth of the "inconsistent" statement made out-of-court. The defendant testified extensively on both direct and cross examination that Pichette had been the aggressor throughout the fight and that he (the defendant) had acted solely in self-defense. Five days after the statement had been admitted, the judge, in the course of his charge, instructed the jury that they could use the statement only for the purpose of determining the credibility of the testimony that the witness Lajoie had given on the stand and that "you are not to believe the contents of the out of [c]ourt statement."

There are several difficulties. The first and most obvious

---

statements is given, the circumstances thereof sufficient to designate the particular occasion shall be mentioned to the witness, and he shall be asked if he has made such statements, and, if so, shall be allowed to explain them."

is that the only aspect of the statement (note 3, *supra*) which was in any way inconsistent with the witness's testimony on the stand (G. L. c. 233, § 23; note 4, *supra*) was that which made her out as an eyewitness to the fight between the defendant and Pichette. The balance of the statement, which portrayed the defendant as the constant aggressor throughout an entirely one-sided fight, was in no way inconsistent with any of the witness's testimony and, in the circumstances, was not admissible under § 23. Except for the testimony of the defendant, the balance of the statement constituted the only thing the jury ever heard or saw which went directly to the heart of the critical question of who had been the aggressor and who had acted in self-defense during the course of the fight. Although the judge correctly instructed the jury as to the only use they could properly make of the portion of the statement which was inconsistent with the witness's in-court testimony, there is room for genuine doubt whether the jury comprehended the import of the general instruction that they should not believe the contents of the statement. The portion of the statement which described the fight the witness testified she had not seen went to the core issue in the case and "there is an especially serious danger that [the] jury . . . disregard[ed the] limiting instructions and allow[ed] the [statement] to influence their deliberations as substantive evidence . . . .. In this light, and considering the condition of the rest of the proof in the case, we cannot say that the defendant might not have prevailed if the . . . [statement] had been excluded. Hence a new trial is called for." *Walter v. Bonito,* 367 Mass. 117, 124 (1975).

The case just cited was decided under a different aspect of § 23, but we are of the opinion that what was said and held there applies with equal force to the circumstances of the present case.

3. Other questions of lesser significance, including questions likely to arise upon a retrial, are considered in the appendix to this opinion.

The judgment is reversed, and the verdict is set aside.

*So ordered.*

Commonwealth *v.* Pimental.

APPENDIX

3(*a*). For the reasons stated in *Commonwealth* v. *Clark,* 363 Mass. 467, 473-474 (1973), and *Commonwealth* v. *Colella,* 2 Mass. App. Ct. 706, 708-709 (1974), there was no error in the denial of the defendant's motion that he be supplied with copies of the criminal records of the persons who would be called by the Commonwealth as witnesses.

3(*b*). The judge did not err in ordering the trial to proceed despite the prosecution's failure to comply with some earlier order (not reproduced in the record) that the defendant be supplied with a copy of the minutes of the grand jury. It was open to the judge to find (as he appears to have done) that the minutes had never been transcribed (through no fault of the prosecution), that only one witness had testified before the grand jury, and that counsel for the defendant had been supplied with a copy of the only relevant police report. The defendant does not argue, or even suggest, that any harm resulted from his not having the minutes in question.

3(*c*). Nor was there any error in the denial of the defendant's motion that he or his counsel be "[ordered] ... to interview [the] witnesses" who would be called by the prosecution. There was nothing to suggest that the prosecution had presented any obstacle to the defendant's interviewing such witnesses (contrast *Commonwealth* v. *Balliro,* 349 Mass. 505, 515-516 [1965]), and any allowance of the motion might have resulted in depriving the witnesses of their respective rights to refuse to be interviewed. See *Commonwealth* v. *Carita,* 356 Mass. 132, 142-143 (1969); *Commonwealth* v. *Gibson,* 357 Mass. 45, 47, cert. den. 400 U. S. 837 (1970).

3(*d*). No abuse of discretion (*Commonwealth* v. *Blackburn,* 354 Mass. 200, 205 [1968]; *Commonwealth* v. *Bettencourt,* 361 Mass. 515, 518 [1972]) is shown in the judge's pretrial denial of the defendant's motion for the sequestration of witnesses. Counsel for the defendant had read the prosecution's entire file; the denial was without prejudice to the renewal of the motion during the course of the trial. As counsel said at the time of the ruling, "Maybe there won't prove to be any reason for it"; the motion was never renewed.

3(*e*). It is unclear why the judge excluded some of the questions which were designed to elicit information as to the defendant's weakened physical condition at the time of the fight. Some of the questions were in proper form and called for simple lay observations as to the defendant's loss of weight and the yellowish color of his skin; all the desired information (much of which was admitted later without objection) was relevant to the question whether the defendant had entertained a reasonable apprehension of great bodily harm at the time of the fight and a reasonable belief that no means other than the knife would suffice to prevent such harm. See *Commonwealth* v. *Houston,* 332 Mass. at 690; *Commonwealth* v. *Kendrick,* 351 Mass. at 212. The portion of the defendant's hospital record which was concerned with a diagnosis of probable hepatitis, made two days prior to the fight, was not accompanied by any offer of medical testimony concerning the probable effect of hepatitis on the defendant's ability to defend himself in a fight, but the portion of the same record to the effect that the defendant was then nauseated, fatigued and in a debilitated condition was relevant and should have been admitted. See G. L. c. 233, § 79.

3(*f*). It does not appear that the exclusion of any of the defendant's questions concerning Pichette's local reputation for quarrelsomeness and violence was based on any lack of a proper testimonial founda-

tion. Once counsel made it clear that there would be evidence that the defendant had been aware of such a reputation at the time of the fight, the evidence should have been admitted, either de bene or following the receipt of competent evidence that the defendant had been so aware. *Commonwealth* v. *Edmonds,* 365 Mass. 496, 501-504 (1974). *Commonwealth* v. *Gibson,* 368 Mass. 518, 526-527 (1975). The defendant later testified that he had heard of Pichette's reputation and that he was "scared for [his] life" during the fight; he should then have been permitted to testify as to his knowledge of Pichette's reputation.

3(*g*). Contrary to what the defendant now argues, the unadorned question to the witness Dupres as to whether she knew how Pichette made money did not call for evidence to the effect that Pichette was a drug pusher. As to the inadmissibility of such evidence generally, see *Commonwealth* v. *Lacasse,* 1 Mass. App. Ct. 590, 595-596 (1973), *S.C.* 365 Mass. 271 (1974).