COMMONWEALTH *vs.* CHARLES E. HARTFORD.

Essex.    October 7, 1963. — December 2, 1963.

Present: WILKINS, C.J., SPALDING, WHITTEMORE, CUTTER, KIRK, SPIEGEL, & REARDON, JJ.

*Practice, Criminal,* Opening statement by prosecutor, Mental examination of defendant, Ordering verdict.    *Evidence,* Leading question, Telephone conversation, Presumptions and burden of proof, Evidence of insanity.    *Self Defence.    Homicide.    Insanity.*

There was no error at the trial of an indictment in the denial of motions attacking as improper a statement by the prosecutor in his opening to the jury of incriminating testimony which he expected his witness to give where, although the witness's testimony when given was not in accordance with the statement, it did not appear that the statement was made in bad faith, the prosecutor in his closing argument expressly withdrew it and asked the jury "to erase it from . . . [their] mind," and the judge in his charge said that the statement was not evidence.    [485–486]

There was no abuse of discretion at the trial of an indictment in permitting leading questions on direct examination of a witness for the Commonwealth in an attempt to rehabilitate his memory.    [486–487]

There was no error at the trial of an indictment for murder of the defendant's wife in the denial of a motion to strike out testimony by an occupant of a house, in which the wife lived apart from the defendant, as to certain telephone conversations between the witness and one whom she stated to be the defendant, although she did not know him and had never talked face to face with him, in view of confirming circumstances that with respect to each call the speaker identified himself as the defendant and asked to speak with his wife, that on one occasion the speaker said he was coming to see his wife and the defendant did so, that telephone calls were made from the defendant's telephone number to the telephone number of such house, and that the defendant testified he made telephone calls to his wife.    [487–488]

Failure to comply with G. L. c. 123, § 100A, the so called Briggs law, previous to the trial of an indictment for murder did not invalidate that trial as a matter of law, and, where the defendant was committed to a State hospital under § 100 for examination by the hospital staff and was later recommitted thereto for examination by his own psychiatrist, the defendant lost no right of substance by such failure. [488–489]

At the trial of an indictment for murder at which evidence, apart from the issue of insanity pleaded by the defendant, clearly warranted a conviction, but the defendant introduced evidence of his insanity at the time of the homicide and there was no contrary evidence introduced by the Commonwealth, the rational probability that the defendant was sane and testimony of witnesses as to his conduct around the time of the homicide warranted the judge in denying a motion for a directed verdict of not guilty on the ground of insanity. [489–490]

At the trial of an indictment for murder of the defendant's wife by shooting her in the back a few yards away from his automobile after she had come out of a house toward the automobile and there had been an argument between them and loud voices or screams and as another man came out of the house, where there was no evidence that the victim or the other man was armed or had made threats prior to the shooting or that the other man ever got very close to the defendant's automobile, the judge did not err in charging the jury that there was no evidence of self defence or evidence which would warrant a verdict of manslaughter. [490–491]

On the issue of insanity of the defendant at the trial of an indictment for murder, there was no error in a charge to the jury in accordance with the principles laid down in *Commonwealth* v. *Chester,* 337 Mass. 702. [491]

INDICTMENT found and returned on May 18, 1962.

The case was tried in the Superior Court before *Lurie,* J.

*George Karelitz* (*Robert J. White* with him) for the defendant.

*Howard J. Camuso,* Assistant District Attorney (*John J. Jennings,* Assistant District Attorney, with him), for the Commonwealth.

SPALDING, J. In this indictment for murder the jury found the defendant guilty of murder in the first degree of his wife Marilyn and recommended that the death sentence be not imposed. See G. L. c. 265, § 2, as amended. The case comes here on appeal, with a summary of the record, a transcript of the evidence, and an assignment of errors under G. L. c. 278, §§ 33A–33G, as amended.

There was evidence of the following: The defendant and Marilyn were married on June 18, 1958. She was fifteen

years old and he was eighteen. Two children were born of the marriage. The marriage resulted in two separations. The first occurred in late 1960 and the second on January 2, 1962, when Marilyn went to live in a house owned by Charles L. Seavey, Jr. Others living in the house included Mr. and Mrs. Mitchell and their two children, and Wayne Seavey, the nineteen year old son of Charles. Late in January the two Hartford children, who had been living with their father (the defendant) and his parents, went to live with their mother. On numerous occasions there were telephone conversations between the defendant and his wife in which the defendant pleaded with her to return to him. On one occasion Marilyn told the defendant that ''[t]here is always a bunch of big boys down there [Seavey's house] to take care of . . . [her]'' in case of trouble.

On February 1, 1962, the defendant telephoned his wife at noon and she informed him that the children were going to remain with her. He left work at 1:30 P.M. and spent some time with Robert Tuck during which he bought six shotgun shells. He took one of his father's cars and drove to his mother's house. He called his wife several times and told her he was coming for the children. He then drove to the Seavey house, presumably to get them. He brought with him a shotgun loaded with the shells bought that day. Upon arriving there he parked his automobile at the side of the house and sounded the horn. Marilyn came out of the house and proceeded toward the car. An argument ensued and the Seaveys and Mrs. Mitchell heard loud voices or screams. At this point the evidence is somewhat confused. Marilyn screamed, ''Charlie, Charlie.'' Charles Seavey started out the front door and at the same moment Hartford (who was also called Charlie) fired one shot[1] from the car, then a second, and possibly a third.

---

[1] The version from each of the witnesses is as follows: The defendant states that after the scream ''I saw the big Seavey come running at me'' and further states that he does not remember anything after that. The defendant later admitted that he was not sure who was coming at him.

Charles Seavey states that just as he got out the door to the top of the doorstep he saw Marilyn catch one blast in the back and that he saw the flash

Marilyn was hit in the back by "two distinct patterns of pellets" of No. 4 bird shot. One of these patterns struck her in the upper back, and the second struck her in the buttocks and legs. When shot Marilyn was about eight yards from the defendant's car. Charles Seavey was also hit by one of the blasts.

The defendant then drove his automobile away from the scene of the shooting, left his automobile, and went into some nearby woods where, in an attempt to shoot himself, he shot away part of the left side of his face. He was found in a nearby house and a trail of blood led to his shotgun which was found in a clearing in the woods. A discharged shotgun shell was found on the floor of the defendant's car. A second empty shell was found in front of the Seavey house, and a third expended shell was found in the chamber of the gun. All of these shells were twelve gauge shotgun shells loaded with No. 4 bird shot and were of the same kind and type which the defendant had purchased earlier that day.

1. Under assignments of error numbered 25, 26, and 40–42 the defendant argues that the Commonwealth's opening contained statements of expected evidence which were prejudicial to him. The prosecutor told the jury that Robert Tuck, a witness, would tell them about a conversation that he had with the defendant in which the defendant told Tuck that he was going to kill his wife and that Tuck would testify that the defendant said to him, "I'm going to get my wife one way or the other." He also told the jury that Noyes, the man from whom the defendant purchased the shotgun shells, would testify that the defendant asked him

of the gun come from inside the car. He states that he proceeded a few steps farther when a second shot was fired which hit him. Then he dove forward near a parked car as a third shot was fired.

Mrs. Mitchell's story was less clear. First she said that she heard shots before Seavey went out the door. Then she said he was by the door on the first shot. She stated later that he was going out the door, and finally on cross-examination she indicated that he was outside before the first shot.

Wayne Seavey testified that he heard "No, Charley," a scream and a bang and that at that moment "[m]y father was just going out the door." Wayne followed his father out the door and heard a second blast while on the front steps with his father about ten feet off the steps. Wayne then heard a third "bang" and his father said, "Duck, Wayne."

which of the two types of shells (No. 6 or No. 4), was the more dangerous and, when informed that the No. 4 shells were "heavier" and "would do the biggest damage," he purchased them. Neither Tuck nor Noyes testified in accordance with the opening.

The alleged impropriety of the opening was raised by the defendant in various ways but the basic question is the same.[2] We are of opinion that there was no error. The prosecutor in his closing argument expressly withdrew the statement with respect to Tuck's testimony and asked the jury to "erase it from . . . [their] mind." "As a general rule, counsel is free to state in his opening anything that he expects to be able to prove by evidence." *Commonwealth v. Clark,* 292 Mass. 409 at 410. It sometimes happens that witnesses, either from lack of memory or otherwise, do not fulfill the expectations of counsel. There is no indication here that the statements in the opening were made in bad faith and it will not be presumed. Moreover, in his charge the judge told the jury that the Commonwealth's opening statement was not evidence and that they should consider only what Tuck and Noyes actually said on the witness stand. In view of the disavowal by the prosecutor and the instructions of the judge, we are of opinion that the defendant's rights were adequately protected. The defendant takes nothing by these assignments.

2. Another group of assignments of error (Nos. 3–17) presents the question of the propriety of certain questions put in direct examination to Tuck, a witness called by the Commonwealth. These questions sought to elicit from Tuck the matters referred to in the Commonwealth's opening, namely, whether the defendant had told him on the day of the shooting that he intended to kill his wife. Tuck, when interrogated as to this alleged conversation, stated that he did not remember. He was then shown a written

[2] After the testimony of Tuck and Noyes motions were filed by the defendant that the prosecutor be instructed to withdraw the unsubstantiated statements. A motion for a mistrial was also presented, and a motion was made that the court instruct the jury to disregard these statements. All of these motions were denied.

memorandum of the conversation to refresh his recollection but Tuck, who could not read, stated that the writing did not aid his memory. Having exhausted Tuck's memory, the prosecutor was permitted to put, subject to the defendant's exception, a series of leading questions which asked him whether the defendant had told him that he was going to kill his wife.

The defendant argues that these questions amount to cross-examination by the Commonwealth of its own witness and exceeded permissible limits. The further contention is made that the interrogation amounted to an impeachment of the witness in violation of G. L. c. 233, § 23.[3] Neither of these contentions can be sustained. There was no violation of § 23, for there was no attempt to "impeach his credit by evidence of bad character." Nor was there any attempt to contradict him by prior inconsistent statements. In view of Tuck's lack of memory this would not ordinarily be permissible. *Langan* v. *Pianowski,* 307 Mass. 149, 151. All that was done here was to permit leading questions to be put in an attempt to rehabilitate Tuck's memory. The judge might have concluded that Tuck was either a hostile witness or one whose memory needed to be refreshed. There was no abuse of discretion in permitting this examination. *Commonwealth* v. *Coshnear,* 289 Mass. 516, 527.

3. Shirley Mitchell, who lived at the Seavey home at the time of the shooting, when called by the Commonwealth was permitted to testify to certain telephone conversations with the defendant. When this evidence was admitted, she had stated that she recognized the defendant's voice. However, on cross-examination she admitted that although the speaker purported to be the defendant and although she had received other calls from him she did not know the defendant and had never talked face to face with him. At

[3] "The party who produces a witness shall not impeach his credit by evidence of bad character, but may contradict him by other evidence, and may also prove that he has made at other times statements inconsistent with his present testimony; but before proof of such inconsistent statements is given, the circumstances thereof sufficient to designate the particular occasion shall be mentioned to the witness, and he shall be asked if he has made such statements, and, if so, shall be allowed to explain them."

this point counsel for the defendant moved that these conversations be stricken and the motion was denied. There was no error.

Of course, the mere fact that the speaker said he was the defendant was not enough to render the conversation admissible. *Bond Pharmacy, Inc.* v. *Cambridge,* 338 Mass. 488, 491. But, even without recognition of the voice, there may be other confirming circumstances which made the conversation admissible. Wigmore on Evidence (3d ed.) § 2155 (1) (b). McCormick on Evidence, § 193, pp. 405–406. We are of opinion that such confirming circumstances existed here. With respect to each call the defendant identified himself as the speaker and asked to speak with his wife. On one of the calls the witness turned over the telephone to the defendant's wife who took it into another room to continue the conversation. On another call the speaker asked if his wife was "running around on him." At another time the speaker told the witness that he was coming down to see his wife and children that night, and the defendant did in fact do so. See *Commonwealth* v. *Aronson,* 330 Mass. 453, 460. A representative of the telephone company testified that four calls were sent from the defendant's telephone number to the Seavey's number during the afternoon of February 1, 1962, at about the time when the witness claimed to have talked with the defendant on the telephone. Finally, the defendant himself testified to having made several telephone calls to his wife on February 1, 1962, and told of the conversations with his wife and some other woman. We think the trial judge rightly left the question to the jury.

4. The defendant argues (assignment of error No. 43) that his rights were impaired because there was no compliance with G. L. c. 123, § 100A, the so called Briggs law. That there is nothing in this contention is squarely decided by *Commonwealth* v. *Vallarelli,* 273 Mass. 240, 249. Although in view of this decision further discussion is unnecessary, we might observe that on February 20, 1962, the defendant was committed to the Bridgewater State Hospi-

tal on motion of the Commonwealth under G. L. c. 123, § 100, for a period ending on March 6, 1962, and it was determined by the staff of that hospital that he was competent to stand trial. The defendant was later recommitted to the same hospital where he was examined by his own psychiatrist, Dr. Kozol. Thus the defendant had the benefit of two commitments with extensive psychiatric examinations, and was enabled to put forward a defence based on insanity. The defendant lost no right of substance by his failure to be examined under G. L. c. 123, § 100A.

5. The defendant excepted to the denials of two motions for directed verdicts of not guilty. The first, which was made at the close of the Commonwealth's opening, need not concern us, for a judge cannot be required to direct a verdict on an opening. *Perry* v. *Carter,* 332 Mass. 508, 509. We turn, therefore, to the second motion which was made at the close of the evidence. That there was evidence, apart from the issue of insanity, which warranted a submission of the case to the jury is too clear to require discussion. There was testimony by Dr. Kozol, a psychiatrist called by the defendant, to the effect that the defendant was insane in the legal sense. The only psychiatrist, Dr. Grunberg, called by the Commonwealth was unable to give an opinion as to the defendant's mental condition at the time of the shooting. The defendant, therefore, argues that since he had introduced evidence of his insanity and there was no contrary evidence introduced by the Commonwealth there was a failure on the part of the Commonwealth to establish his guilt by proof beyond a reasonable doubt. The answer to this contention may be found in *Commonwealth* v. *Clark,* 292 Mass. 409, where it was said at page 415, "[A]lthough the burden of proof is on the Commonwealth to prove the defendant mentally responsible for crime . . . the fact that a great majority of men are sane, and the probability that any particular man is sane, may be deemed by a jury to outweigh, in evidential value, testimony that he is insane." Thus the rational probability of sanity and the testimony of other witnesses as to the con-

duct of the defendant around the time of the alleged homicide were sufficient to warrant the judge in refusing to direct a verdict for the defendant on the ground of his insanity.

6. The judge did not err in charging the jury that there was no evidence of self defence. Assignment No. 49. There was no evidence that either of the Seaveys or Marilyn was armed. The most that the evidence would show is the possibility of fear on the part of the defendant that Charles Seavey might assault him when he reached the automobile in which the defendant was sitting. And there is no evidence that Seavey ever got very close to the defendant's car.[4]

There is no evidence of any threats made by either Charles Seavey or Marilyn immediately prior to the shooting. And it is reasonable to infer that the defendant could easily have placed himself out of danger by driving away. "In order to create a right to defend oneself with a dangerous weapon likely to cause serious injury or death, it must appear that the person using the weapon had a reasonable apprehension of great bodily harm and a reasonable belief that no other means would suffice to prevent such harm. . . . The right of self defence does not accrue to a person until he has availed himself of all proper means to avoid physical combat. . . ." *Commonwealth* v. *Houston,* 332 Mass. 687, 690. Applying that test here we are of opinion that the judge rightly withdrew this issue from the jury's consideration.

7. The defendant urges (assignment of error No. 50) that it was error for the judge to charge that there was no evidence which would warrant a verdict of manslaughter. We do not agree. "[M]anslaughter . . . [is] 'a killing from a sudden transport of passion or heat of blood, upon a reasonable provocation and without malice, or upon sudden combat.'" *Commonwealth* v. *Soaris,* 275 Mass. 291, 299. See *Commonwealth* v. *Webster,* 5 Cush. 295, 304–308;

---

[4] Marilyn was shot eight yards from the defendant's car and the evidence indicates that Seavey did not come as close as that.

*Commonwealth* v. *Baker, ante,* 107, 119. There was no evidence of any sudden combat and no evidence which could provide the basis for finding, under an objective test, a reasonable provocation which would result in a sudden transport of passion. The evidence indicates that the defendant had an argument with Marilyn just before the shooting but words alone cannot provide a reasonable provocation. *Commonwealth* v. *Webster, supra,* at pages 305–307.

There was, to be sure, evidence that the defendant feared an assault from Charles Seavey but all three shots were fired before Seavey, who was unarmed, got near the car. Moreover, two of the shots hit Marilyn in the back as she left the side of the car and, finally, there was no evidence that the defendant could not have easily avoided any possible danger by driving away. The evidence fails to establish a provocation of the sort which would reduce the killing to manslaughter.

8. Other matters require brief comment. Despite the defendant's contention to the contrary, the judge did not charge on the facts. His charge to the jury on the question of insanity was in accordance with the principles laid down in *Commonwealth* v. *Chester,* 337 Mass. 702. The defendant does not contend that these principles were misstated; rather he urges that we adopt a rule somewhat similar to that set forth in *United States* v. *Currens,* 290 F. 2d 751, (3d Cir.) a course which we decline to adopt.

9. We have examined the entire record and have carefully considered all of the contentions of the defendant in the light of our duty under G. L. c. 278, § 33E, as amended by St. 1962, c. 453, and are of opinion that justice does not require a new trial; nor does it permit the entry of a verdict of a lesser degree of guilt.

*Judgment affirmed.*