COMMONWEALTH vs. JOSEPH P. REMBISZEWSKI, JR.

Worcester.   November 6, 1972. — March 15, 1973.

Present: TAURO, C.J., REARDON, HENNESSEY, KAPLAN, & WILKINS, JJ.

*Evidence*, Admissions and confessions; Hospital record; Leading question; Opinion: expert. *Error*, Whether error harmful. *Homicide*. *Practice, Criminal*, New trial.

Failure by the defendant in a murder case to reply when a doctor made a statement to the police in his presence which tended to contradict statements made by the defendant did not constitute an admission by silence where it appeared that at the time the defendant either was, or was feigning to be, incoherent, that a large part of the doctor's remarks referred to x-ray pictures to which protest was unlikely, and that the defendant had been advised by the police that he could cease coöperating with them whenever he chose. [315–316]

At a murder trial admission of hearsay testimony concerning statements made by a doctor to the police in the defendant's presence was harmless error in the circumstances.   [316–317]

At the trial of a criminal case where a portion of a hospital record containing an admitting diagnosis was in evidence, there was no error in the admission of testimony by a doctor, familiar with the hospital's procedures from personal experience, giving his opinion about the nature and value of such admitting diagnoses, although the doctor had no knowledge of the particular circumstances of the entry in question.   [317–318]

The trial judge in a criminal case could allow the prosecutor to put a leading question to a witness for the Commonwealth in order to refresh her memory.   [318–319]

Where, at the trial of an indictment for the murder of his wife, the defendant testified that she had been struck by an unknown assailant while she was outside an automobile, and police officers testified that the defendant had stated that his wife had been struck from the rear while she was inside the car, but had later vacillated as to whether she had been struck inside or outside the car, there was no error in permitting a forensic pathologist to testify, in response to a hypothetical question, that it was improbable that the victim had been struck from the rear or while inside the car. [319–320]

Where there was no evidence at a trial for the murder of the defendant's wife that could support a verdict of manslaughter, a charge on manslaughter was not called for merely because the prosecutor in his closing speech to the jury imagined a quarrel between the defendant and his wife and because there were scratches on the defendant's face following the events in question.   [320–321]

There was no abuse of discretion in the denial of a motion for a new trial in a murder case on the ground of newly discovered evidence where the evidence presented in support of the motion was insignificant. [321–324]

INDICTMENT found and returned in the Superior Court on May 8, 1970.

The case was tried before *Beaudreau*, J.

*Albert L. Hutton, Jr.*, for the defendant.

*Manuel Morse*, Assistant District Attorney, for the Commonwealth.

KAPLAN, J.   Joan Rembiszewski was killed in the early morning of October 12, 1969.   Her body was found lying beside a station wagon on a cart path in a wooded area off Route 146 in Sutton, Massachusetts.

Her husband, a Worcester school teacher, was indicted for murder and was tried by a jury who found him guilty of murder in the first degree but recommended that the sentence of death be not imposed.   Subsequently the defendant made a motion for a new trial which the judge denied after hearing.   The case was taken under G. L. c. 278, §§ 33A–33G, and is here upon assignments of error of which all but six have been waived by the defendant.   We give here a sketch of so much of the case as is needed to orient the several assignments.

Around 2 A.M. on Sunday, October 12, the defendant was discovered on his hands and knees on the edge of Route 146 about 200 feet from the entrance to the cart path.   He had signaled feebly and attracted the attention of two couples passing in a car.   They stopped and tried to help the defendant, then flagged another passing car and asked the occupants to summon the police, which they did.   The defendant meanwhile, in a seemingly hysterical condition, kept repeating "Help Joan.   They hit her with a hammer," or words to that effect.   The defendant's station wagon and a woman's body were found upon brief search, and the identities of the defendant and the dead woman quickly ascertained.

The police took the defendant to St. Vincent Hospital

in Worcester where Dr. Arthur S. Giroux examined him as well as X-rays that were taken of his head. He had complained of facial and head pains and continued in a disturbed condition, lapsing into some incoherence when the recent episode was broached. A police officer known to the defendant attempted to carry on an interrogation or conversation; the officer recited the *Miranda* formulas although the defendant was not under arrest. Later that morning the defendant was taken from the hospital to the State police barracks at Grafton and interrogated. In the afternoon of the same day the defendant returned to the hospital where he was examined by a Dr. Walsh.

On October 16 the defendant went voluntarily to the office of the State police for interrogation. The police confronted the defendant with facts about his relations with two women which raised the possibility that he might have had a motive or impulsion to become violent toward his wife. It appeared that the defendant had spoken to each of the women of marrying her after divorcing his wife; the second woman, whom he had seen on the day before the murder, may have become possessive even though he indicated at trial that on his part he had not had serious intentions. On October 15, a hammer had been found near the scene which could qualify as the murder weapon. Upon further police investigation, the defendant was charged with the killing.

It was established that on the fatal night the defendant and his wife had dinner at the house of friends in Auburn, Massachusetts. They left in the station wagon about 12:30 A.M. for their home in Grafton.

Beginning at this point, the defendant told a story — his testimony at trial being consistent in outline with his statements to the police, but inconsistent or vaguer in details — which suggested that his wife was murdered by two unidentified black men who were conceivably intending robbery.[1] The jury evidently disbelieved the

[1] Some of the defendant's testimony at trial suggested that the black men stole small amounts from his wallet or his wife's purse; this was in contrast to his statements to the police that he had not been

story, for which there was virtually no corroboration, and on the evidence concluded instead that the defendant had committed the crime.

The defendant said that on the drive from Auburn, reaching a point on Grafton Street just west of the Mill-bury-Grafton town line, he saw a black car ahead, parked at an angle on the road, with a man, apparently hurt, lying face down near the car. Intending to offer help, the defendant stopped his car and he and his wife began to alight, whereupon the man stood up and advanced on the defendant, while another man approached his wife brandishing a knife. The defendant described these men as black, wearing black clothes, and at most six feet tall.[2] They forced his wife and himself into the front seat of the station wagon and seated themselves in the rear seat. They ordered the defendant, who was at the wheel, to drive around the area on an erratic course. During the drive one of the men told Mrs. Rembiszewski to stop crying and slapped her. Finally the defendant was ordered to pull off Route 146 and go down the cart path. The car was stopped when it reached a clearing alongside a heap of junked car frames, car parts, and debris. The defendant and his wife were told to get out of the car. As the defendant stepped out, one of the men pulled him by the shirt and he lost his glasses. He saw his wife being struck with some instrument.[3] Then the defendant ran away, pursued by one of the men who hit him over the head with a stick and knocked him down. He said he remembered nothing from that time until he was discovered on the shoulder of the road.[4]

robbed. Rings and a wristwatch on the victim's hand were undisturbed.

[2] The defendant had spoken to the police of a third black man who followed in the black car behind the station wagon after it was commandeered, but the third man was nonexistent or nebulous in the defendant's testimony at trial.

[3] See point 4 and note 11 below regarding the defendant's statements and testimony as to whether the victim was struck in the station wagon or on the cart path outside and whether the instrument used was a hammer.

[4] There was evidence that when the station wagon was taken in charge by the police the rear doors were locked and there was a film of dust on the rear seat and rear arm rests.

For the Commonwealth, one Warner P. Peters testified that on the night of the crime, about 1 A.M., he was traveling in his car with a companion, Ellen T. M. Robert. He saw a station wagon, which he later with difficulty identified as the Rembiszewskis', pass him in a dangerous fashion[5] and pull off Route 146 onto the path where the body was later found. He swore that a man was driving, a woman was in the passenger's place on the front seat, and the rear seat was empty.

Mrs. Rembiszewski's body was found alongside the station wagon, on the driver's side, head to the front of the car, her legs extended, and clothing in place. According to medical testimony, death had been caused by a number of severe blows with an instrument crushing her forehead and upper face. There was a pool of blood under her head, the clothing about her neck was bloodstained, and a small amount of blood had spattered the lower part of the exterior left front door of the car and the panel below. No blood was found on the defendant's person or clothing.[6] After three days search of the area by the police, a ballpeen hammer was found in three inches of water in a swampy spot about 185 feet from the car and some fifty-six feet from a dry place from which it could have been thrown. There was expert opinion that the hammer had been in the water less than a week. A small quantity of human blood was detected where the handle of the hammer met the hammer head. This hammer, according to the doctors, could have been used to inflict the massive lacerations of the victim's head.

1. A police officer testified to events at St. Vincent Hospital to which the defendant was brought from the scene. He said: "We asked the doctor [Dr. Giroux] if there was any injuries to Mr. Rembiszewski's head, or anything like that, which showed up on the x-rays. He

[5] The station wagon blinked its headlights and passed close to Peters, nearly forcing him off the road.

[6] Except for a bloodstain on a sock; see point 1 below about a puncture of the heel of the defendant's foot.

showed us the film; there wasn't. . . . At the time he told him there was no injuries, no visible injuries on him. . . . He told him he hadn't found any injuries at all except what was on the foot." As indicated, the defendant was present and heard Dr. Giroux's statement. Defence counsel objected and excepted to the allowance of the officer's testimony apparently on the ground that it was hearsay. The judge may have conceived of Dr. Giroux's statement as being accusatory, since it tended to contradict the defendant's claim that he was suffering pains of the head and face, so that the statement could be expected to provoke a reply; thereby the officer's testimony might become admissible as an adoptive admission by silence. *Commonwealth* v. *Boris*, 317 Mass. 309, 317. *Refrigeration Discount Corp.* v. *Catino*, 330 Mass. 230, 237–238. *Commonwealth* v. *Wallace*, 346 Mass. 9, 14. See Wigmore, Evidence (Chadbourn rev.) §§ 1071, 1072; McCormick, Evidence (2d ed.) § 270. But the doctor's remarks referred in large part to the objective results of the X-ray pictures, hence a protest on the defendant's part was not likely because it would seem futile; moreover the defendant was, or was feigning to be, incoherent at the time. Add that *Miranda* advice had just been given to the defendant that he could cease coöperating with the police whenever he chose: this suggests caution in allowing an adverse use of his failure to speak. See McCormick, *supra*, § 161. Cf. *Commonwealth* v. *McDermott*, 123 Mass. 440, 441; *Commonwealth* v. *Burke*, 339 Mass. 521, 532; *Commonwealth* v. *McCambridge*, 351 Mass. 516, 519–521; *Commonwealth* v. *Freeman*, 352 Mass. 556, 561–563; *Vitali* v. *United States*, 383 F. 2d 121, 123 (1st Cir.). This court's general wariness of adoptive admissions should here be recalled. *Refrigeration Discount Corp.* v. *Catino, supra,* at 237. We think the judge should have rejected the officer's testimony on the particular point.[7] Yet considering that nothing was made

[7] The Commonwealth seeks to justify the judge's ruling on an amorphous theory of "res gestae," but the case chiefly relied on,

of the defendant's silence at any later stage of trial, and that Dr. Giroux was himself called and testified fully about his findings, we cannot believe that the error was material. What emerged from Dr. Giroux's testimony was that the X-rays showed no fracture of the skull; that there were visible but minor scratches or abrasions of the face; and that there was a visible puncture of one heel which was cleaned and bandaged at the hospital.[8] Thus the defendant's condition as verified was not inconsistent with his protestations, the absence of a fracture of the skull being compatible with a headache and even with a brain concussion, as the doctor himself said.

2. Returning to the hospital during the afternoon of October 12, the defendant was examined by Dr. Walsh. A hospital information sheet, signed by Dr. Walsh, stated under the caption "Admitting Diagnosis" that the defendant had been "Beaten up in Sutton, Mass." Upon cross-examination of Dr. Giroux, defence counsel emphasized this "diagnosis." The prosecutor countered on redirect examination by eliciting from Dr. Giroux, over objection and exception, that the admitting diagnosis "is put down by the secretary in the emergency room at that time. The patient will come in and voice his complaint; and she'll put down the admitting diagnosis which, in actuality, is not even a provisional diagnosis; it's the impression of the secretary. . . . I really don't pay too much attention to this because this is put down by the secretary." [9] On recross-examination defence counsel asked, "So that you, of your own knowledge, do not know what transpired as to the making of the record and as to the relationship of the making of the record and Doctor Walsh? " Answer, "Correct."

This part of the hospital record, if admissible under

---

*Commonwealth* v. *Simpson*, 300 Mass. 45, is hardly in point (see especially at 49–51). The issue in the present case is closer to that in *Commonwealth* v. *Wallace*, 346 Mass. 9, where an attempted "res gestae" circumvention of the hearsay objection failed.

[8] The defendant when discovered was without one or both shoes which had been recovered before he left for the hospital.

[9] The more formal portion of this record was "Physician's Report."

G. L. c. 233, § 79, as amended through St. 1959, c. 200, as evidence concerning "treatment and medical history" (as distinguished from "the question of liability"), see *Commonwealth* v. *Concepcion*, 362 Mass. 653, 655–656, was still "merely evidence which may be contradicted, qualified, believed or disbelieved." *Commonwealth* v. *Franks*, 359 Mass. 577, 581. Dr. Giroux, although not specifically concerned with record keeping at the hospital, knew the procedures there from personal experience and observation (he also knew Dr. Walsh and the conditions of his work at the hospital), and was in a position to give his opinion about the nature and value of such admitting diagnoses. See *Kenney* v. *Sears, Roebuck & Co.* 355 Mass. 604, 610 (service engineer allowed to testify concerning electrical matters although not an electrician). That he had no knowledge of the particular circumstances of the entry in question, as appeared from the recross-examination, went to the weight of his testimony, not its admissibility. See *Potter* v. *John Bean Div. of Food Mach. & Chem. Corp.* 344 Mass. 420, 424; *LeBlanc* v. *Ford Motor Co.* 346 Mass. 225, 232. (Of course the defence, when it put on its own case, might have tried to make the record count for more by bringing forward further proof — for example, by calling Dr. Walsh — but this the defence did not attempt.)

3. Miss Robert, Peters's companion, was called by the prosecution and testified that she saw a station wagon as testified to by Peters; looking into it as it passed by, she observed a man driving but didn't know if there was anyone else in the car; she didn't observe the car again. She said she had some conversation with Peters about the car. At this point, Miss Robert having exhausted her memory, the prosecutor was permitted to ask her at what stage she had the conversation with Peters (answer, right after the car passed) and whether "as a result of [the conversation] . . . you saw this car go into a path . . . ?" Miss Robert answered that she had not seen the car go into a path. The defence argues that the questions about a conversation with Peters

tended unfairly to corroborate Peters by suggesting that Miss Robert had said — to Peters and possibly to the prosecution — that she saw the car turn into the path. (The defence had previously tried to discredit Peters by introducing his criminal record and attempting to show that he had made prior inconsistent statements to the police.) The quoted question was peculiar in form and somewhat suggestive, but it was open to the trial judge to allow the examiner to put a leading question to his own witness in order to refresh memory. *Guiffre* v. *Carapezza*, 298 Mass. 458, 459–460. See McCormick, Evidence (2d ed.) § 6; Hughes, Evidence § 184. Anyway, the prosecution's foray did little to further its case, since Miss Robert held to her testimony that she had not observed the car making a move into the cart path.

4. A forensic pathologist, Dr. George W. Curtis, after testifying about the condition of the victim's head and body, the nature of the blows struck, the spattering of blood in various assumed positions of the victim and assailant, and the cause of death, was asked whether the wounds received were compatible with the victim's being struck from the rear. The question was objected to but the witness was allowed to answer: "Probably not." Over objection the witness was then asked hypothetically whether the wounds could have been inflicted by one sitting in the rear of a car with the victim sitting on the front seat. Again the answer was "Probably not." These questions were within the expert competence of the witness, see *Commonwealth* v. *Dorr*, 216 Mass. 314, 317; *Commonwealth* v. *Burke*, 344 Mass. 243, 248, but it is argued that there was no foundation in the evidence for the hypothesized situation of an assault upon the victim while she and her assailant were still in the car. Cf. *Brown* v. *United States Fid. & Guar Co.* 336 Mass. 609, 613–614; *State Bd. of Retirement* v. *Contributory Retirement Appeal Bd.* 342 Mass. 58, 65–66. The vice of putting such a hypothetical case, according to the defence, was that it suggested that the defendant was asserting that the murder had in fact been carried

out in that way in the car, whereas it manifestly could not have been so perpetrated while still leaving the interior of the car free of bloodstains, as was the case here.[10]   Thus, argued the defence, the defendant's entire position in the case might have been compromised.

It appears, however, that the defendant vacillated in describing the assault on his wife.   In his statements to the police, as recounted at the trial by two officers, he first said that she had been hit with a hammer while she was inside the car; later he said he was not certain whether she was inside the car or outside when she was struck.   At the trial the defendant testified she had not been struck while in the car; he denied having said the contrary to the police, then claimed that he was in such condition that he did not know what he said to the police at the time.[11]   The prosecution was entitled to elicit an opinion directed to the defendant's first version of the facts as testified to by the police officers.   In view of the gross improbability that the entire assault could have occurred inside the car, the jury could perhaps conclude that the defendant had merely misspoken or been misunderstood during the police interview; but that was a matter for the jury and hardly a reason for excluding the hypothetical question.

5. The judge instructed the jury as to murder in the first degree in its two branches, murder committed with "deliberately premeditated malice aforethought," or "with extreme atrocity or cruelty" (G. L. c. 265, § 1); he also charged them with regard to murder in the second degree.   The defendant claims that the judge committed error in refusing to instruct the jury, in addition, that they could bring in a verdict of guilty of voluntary manslaughter.   The request and refusal occurred after

[10] There was evidence of a very small bloodstain on a chrome strip on the interior of the right front door, but it is fair to assume that this was unrelated to the events of October 12.

[11] The defendant also vacillated in his references to a hammer. A hammer figured in his exclamations when discovered at the roadside and thereafter in his statements to the police; at the trial he said he never saw a hammer, only the handle of some instrument "coming down" or "coming up."

closing arguments and the judge's charge to the jury, without a prior request for instructions, but the exception could nevertheless be entertained. *Commonwealth v. Moore*, 323 Mass. 70, 77. *Commonwealth v. Benders*, 361 Mass. 704, 707. When asked to identify any evidence in the case that could support a verdict of manslaughter, defence counsel could not do so but pointed instead to the prosecutor's closing speech to the jury in which he imagined an argument between the defendant and his wife about divorce, leading to a struggle. In his brief the defendant suggests that the jury, from the presence of scratches on the defendant's face, could have found an attack by the wife upon the defendant amounting to provocation. But the judge would have been wrong to charge on manslaughter without some supporting evidence of the commission of that crime. *Commonwealth v. Moore, supra*, at 78. *Commonwealth v. Campbell*, 352 Mass. 387, 392. *Commonwealth v. McCauley*, 355 Mass. 554, 559. *Commonwealth v. Costa*, 360 Mass. 177, 184. Here, quite apart from the fact that in the defendant's own submission during the trial he engaged in no struggle with his wife, the proof did not furnish a basis for a finding that the defendant killed in a sudden transport of passion but without malice. It is an extravagant suggestion that scratches by the wife could serve as provocation for a malice-free but ferocious attack by the defendant with a deadly instrument. See *Commonwealth v. Hartford*, 346 Mass. 482, 490–491; *Commonwealth v. Kendrick*, 351 Mass. 203, 210–213; *Commonwealth v. Kinney*, 361 Mass. 709, 711. The facts, indeed, might have led to the verdict of murder in the first degree by reason of extreme atrocity or cruelty, where malice could be "presumed" regardless of provocation and sudden passion. *Commonwealth v. Rogers*, 351 Mass. 522, 532–533.

6. The trial was concluded by sentence on December 2, 1970. A motion for a new trial was filed on December 4, 1970. Counsel's affidavit in support of the motion was dated August 23, 1971. Evidence was taken on

August 30 and September 2, 1971. On September 16, 1971, the motion was denied.

The defendant does not contend in this court that the evidence received at the trial was insufficient to justify the jury's verdict,[12] but he asserts that new material brought forward on the post-verdict motion called for a retrial and that the trial judge, in denying it, abused the broad discretion which he undoubtedly has in considering such a motion. *Commonwealth* v. *Stout,* 356 Mass. 237, 243. *Commonwealth* v. *Robertson,* 357 Mass. 559, 562. *Commonwealth* v. *Bernier,* 359 Mass. 13, 16.

First, Miss Robert, who was in the car with Peters, now testified for the defence that Peters had been drinking rather steadily and was "feeling good" all during the night of October 11–12. Miss Robert had been called by the Commonwealth at the trial, but defence counsel had not interrogated her on the matter of Peters's sobriety, although he had put questions to Peters suggesting that Peters might have been drinking. The judge chose to give counsel another chance with Miss Robert although he was probably not obliged to do so, cf. *Commonwealth* v. *Underwood,* 358 Mass. 506, 510–511; *Commonwealth* v. *Richardson,* 361 Mass. 661, 663, but the product of the examination was not impressive. Although she said Peters "wasn't sober" she also indicated that he was in a condition to drive, and in fact he drove a considerable distance that night. A police officer testified at the hearing on the motion for a new trial that on the day following the murder Miss Robert had told him that Peters had had "a couple of beers" and that "he wasn't drunk in any way."

Second, one Alfred J. Richard, who lived near the place of the defendant's alleged encounter with the black men, testified that he saw three men passing by his house

---

[12] The judge denied the defendant's motion for a directed verdict at the close of the Commonwealth's case and also denied requests for rulings at the close of all the evidence which were viewed as equivalent to a motion for a directed verdict. Exceptions to these rulings were expressly waived.

(one of them apparently crossing a neighbor's property) about 10 P.M. before the murder. Richard described two of these men as being "on the colored side" or "on the dark side"; he was unable to describe the third. He said two of the men were about five feet, six inches tall, and two were wearing light colored clothes, one dark clothes. Richard said that after learning of the murder he had reported his observations to a police officer, whom he identified as present in the court room, but the police did not follow up with him, and he had not come forward until three weeks before the new trial hearing, when he spoke to defence counsel. When it is considered that there were black families residing in the neighborhood; that Richard's description of the men was flimsy and in part contradicted the defendant's description of the black men who supposedly waylaid him; and that the officer identified denied ever seeing Richard or being tendered the information, Richard's testimony seems frail indeed.

Third, the defendant called six witnesses[13] who were at the scene of the crime when or shortly after the police investigation began on the morning of October 12. They testified that a car stopped near the place at the highway where several police cars had drawn up. This passing car was evidently the only one that had stopped after the police arrived, although several slowed down as they passed the spot. Four or five black men got out of the car and walked toward the top of the cart path. The police ordered them to leave. The height of the men was variously described as "fairly tall . . . from 5–8 to 6 feet," "fairly big . . . maybe 5–11 . . . maybe 6 feet." Three witnesses said the men were wearing berets, either black or red; one testified they were not wearing hats. The men were further described as wearing black jackets with red or orange trim or lettering, leaving the impression on one witness that they may have been members

---

[13] These were three of the four occupants of the car that discovered the defendant on the shoulder of the road, and the three occupants of the car that summoned the police and then returned to the scene.

of a bowling league or the like.   They seem to have been innocent but curious passersby.

Even if we were to overlook the weight which should be accorded to the decision of the trial judge on a motion for a new trial, we could not disagree with his conclusion that "[n]o credible material evidence was presented at the hearing to warrant a new trial."   Some suggestion is made that law enforcement officials improperly failed to communicate to the defence information about the witnesses' observations of black men, but this remains at the level of mere innuendo.

The transcript has been read in the light of our power and duty under G. L. c. 278, § 33E.   We do not find reason to disturb the conviction.

*Judgment affirmed.*