COMMONWEALTH vs. DAVID EARL SPEAR.

Suffolk. November 19, 1973. — December 6, 1974.

Present: ROSE, KEVILLE, & GOODMAN, JJ.

*Homicide. Practice, Criminal*, Charge to jury. *Evidence*, Dying declaration, Of consciousness of guilt. *Firearms*.

At the trial of an indictment for murder, where there was no direct evidence of the circumstances in which the victim was shot, but some evidence of provocation, sufficient basis existed for an instruction to the jury concerning manslaughter. [689-693]

Where a wounded man, after indicating that he was in fear of death, named the defendant as his attacker and in fact died from his wounds about seven hours later, the identification was admissible as a dying declaration at the defendant's trial for murder. [694]

At the trial of a murder indictment, there was no error in admitting evidence that the defendant frequented a certain location prior to the crime but not thereafter. [694-695]

A finding that the defendant in a murder trial was guilty of manslaughter was warranted by evidence of the victim's dying declaration naming the defendant as his assailant, even though the declaration was uncorroborated except peripherally. [695]

INDICTMENTS found and returned in the Superior Court on September 22, 1972.

The cases were tried before *Dwyer*, J.

*Jack I. Zalkind* (*Chester C. Paris* with him) for the defendant.

*Thomas J. Mundy, Jr.*, Assistant District Attorney, for the Commonwealth.

GOODMAN, J. At about 7:30 P.M. on April 25, 1972, a man, identified later as Willie Daniel, walked into a barber shop on Northampton Street in Boston. He said, "Help me. I've been shot. I don't want to die," and fell

to the floor. The barber telephoned the police and, as he was doing so, Daniel staggered to his feet and out the door. He fell again on the sidewalk a few feet from the entrance to the barber shop. In about ten minutes the police came; they found Daniel lying on the sidewalk. An officer knelt down beside him and asked what had happened. He grabbed the officer's arm and said, "Please, officer, don't let me die. Don't let me die." The officer asked him, "Who shot you?" and he answered, "David Spears."[1] The officer also took a fully loaded gun in a holster from the inside pocket on the right side of Daniel's vinyl outer jacket. Daniel was taken to the hospital where he underwent surgery and died at 2:15 A.M. of a gunshot wound of his chest.

On the day after the shooting a warrant was issued for the arrest of the defendant on a murder charge, and on July 1, 1972, he was apprehended. He was indicted for first degree murder and was found guilty of manslaughter. He was also indicted and found guilty of unlawfully carrying a firearm. He appeals these convictions under G. L. c. 278, §§ 33A-33G.

At the trial, in addition to evidence on which the above narrative is based, there was evidence from which the jury could have found that the defendant was the "David Spears" named by the deceased and that after the shooting the defendant was absent from the area which he had previously frequented. Also, an officer testified that the defendant, when arrested, admitted that he was "down and around the area," but denied that he had anything "to do with this." The defendant did not take the stand, and there were no other witnesses to the actual shooting or the events which preceded it. The only additional evidence from which some of the circumstances of the shooting might be gleaned came from Dr. Curtis, the

---

[1] The officer further said, "Who?" and Daniel said, "David Spears." The officer then said, "Are you sure?" Daniel answered, "Ya, David Spears."

medical examiner who had performed the autopsy, and from a police expert who had examined the clothes of the deceased. The victim's hospital record and his clothes were in evidence.

At the close of the evidence the trial judge allowed a motion for a directed verdict on so much of the indictment as charged first degree murder and denied the motion "as to . . . murder in the second degree, and manslaughter." He charged the jury on both voluntary and involuntary manslaughter, and the defendant excepted.[2] The jury found the defendant not guilty of second degree murder and guilty of manslaughter. The court had also submitted to the jury the charge of unlawfully carrying a firearm, and they found the defendant guilty of that charge. The defendant then renewed his motion for directed verdicts as to manslaughter and unlawfully carrying a firearm. See G. L. c. 278, § 11. It was denied.

The defendant assigns as error and argues that (1) on the evidence, the trial judge erred in instructing the jury as to manslaughter, (2) the victim's naming of the defendant was inadmissible as a dying declaration, (3) it was error to admit the testimony that after the shooting the defendant was not seen in the particular vicinity and to instruct the jury as to consciousness of guilt on that basis, and (4) verdicts should have been directed on the manslaughter and gun carrying charges.

1. The defendant's attack on the propriety of charging the jury on manslaughter relies on *Commonwealth* v. *Rembiszewski*, 363 Mass. 311, 320-321 (1973), in which the defendant complained that a charge of voluntary manslaughter had not been given and in which the Supreme Judicial Court said, "But the judge would have been wrong to charge on manslaughter without some supporting evidence of the commission of that crime.

---

[2] Whether or not to instruct on manslaughter had apparently been discussed with counsel.

[Citing cases.]" See *Commonwealth* v. *Corcione*, 364 Mass. 611, 618-619 (1974); *Commonwealth* v. *Caine*, 366 Mass. 374, 375 (1974), citing *Commonwealth* v. *Bouvier*, 316 Mass. 489 (1944), and *Commonwealth* v. *Rembiszewski, supra*, at 320-321. The Commonwealth replies in effect that, though there was no direct evidence of the shooting, the testimony of Dr. Curtis and the condition of the victim's vinyl jacket furnished "some supporting evidence" of provocation on which the instruction could be based. Dr. Curtis testified that the bullet which resulted in death had entered the victim's back approximately twelve inches from the base of the neck and about four and a half inches to the left of the midline. There was another bullet, lodged in the left arm, which had entered the back of the arm about six inches below the crest of the shoulder. The fatal bullet had traveled upward from left to right and back to front and had entered the body at an angle of about twenty degrees. [3] The bullet had apparently been fired from the left side, somewhat more than a yard away. Dr. Curtis also testified that the victim had an abrasion on his forehead. The vinyl outer jacket, which the victim wore when shot, had two bullet holes. There was a rip in the right sleeve, and the two top buttons were missing.

The Commonwealth points particularly to the relative locations of the bullet hole in the jacket and the bullet hole in the victim's body. Their failure to correspond[4] indicates, the Commonwealth argues, that, when shot, the deceased had his arm raised (presumably his right arm) as if throwing a punch or reaching for the gun

---

[3] Dr. Curtis, on the stand, indicated the angle but was not asked, for the record, to give its measurement. Defense counsel in his argument for a directed verdict stated that the angle was "something like twenty degrees."

[4] The bullet hole in the jacket is farther to the left of the midline than the bullet hole in the victim's body.

found in his jacket pocket.[5]   To be sure, much of the evidence points away from a struggle or confrontation and more persuasively to second degree murder.   But it cannot be said that the Commonwealth's scenario, though not without flaws, is an "extravagant suggestion" (*Commonwealth* v. *Rembiszewski,* 363 Mass. at 321) which would not "permit a jury rationally to find him guilty of the lesser offense and acquit him of the greater." *Keeble* v. *United States,* 412 U. S. 205, 208 (1973). *Driscoll* v. *United States,* 356 F. 2d 324, 327 (1st Cir. 1966), vacated on other grounds, *Piccioli* v. *United States,* 390 U. S. 202 (1968).   The significance of the evidence, in whole and in part, was for the jury.   See *Commonwealth* v. *Campbell,* 352 Mass. 387, 397-398 (1967); *Commonwealth* v. *McCauley,* 355 Mass. 554, 560 (1969); *United States* v. *Huff,* 442 F. 2d 885, 890 (D. C. Cir. 1971).

Moreover, involved here is the criterion for submission to the jury of mitigating matter rather than the standard for sufficiency of evidence necessary to convict, which may require a tighter rein on speculation.   " [T]he violence of sudden passion, occasioned by some great provocation, which in tenderness for the frailty of human nature the law considers sufficient to palliate the criminality of . . . [murder]" (*Commonwealth* v. *Webster,* 5 Cush. 295, 304 [1850]) is essentially a defense, albeit partial, differing from self-defense in that the latter gives complete absolution.   The inference of malice from the intentional shooting may be negated "by a showing that

---

[5] Although the question of manslaughter was not argued at the trial by either party, the possibility of a confrontation was placed before the jury, albeit in a somewhat different context.   The defendant's counsel argued that since the victim was shot in the back, it might well be that he did not see the defendant, while the Commonwealth argued that the path of the bullet indicated that the gun was fired at relatively close range and from the side, and pointed out the failure of the bullet holes to correspond, leading to the inference that the victim had his right arm raised when shot.

the homicide was committed in self-defence and was therefore excusable, or by a showing of circumstances which although they would not excuse or justify the act would mitigate the crime from murder to manslaughter." *Commonwealth* v. *Kendrick,* 351 Mass. 203, 210 (1966). *United States* v. *Alexander,* 471 F. 2d 923, 943 (D. C. Cir. amended opinion 1973), cert. den. sub nom. *Murdock* v. *United States,* 409 U. S. 1044 (1972) (" [P]rovocation is *not* an element of manslaughter, . . . but a *defense* to second degree murder" [emphasis in original].).

We look, therefore, for guidance to such cases as *Commonwealth* v. *Houston,* 332 Mass. 687, 690-691 (1955), in which the court said, "While the evidence in the present case strongly suggests that the defendant stabbed Foster in circumstances which would not justify the use of a knife, it cannot be said that there was *no evidence* from which the jury could have found that he acted in self defence" (emphasis supplied). Applying this to the "defense" of provocation, it was not error to submit the question of voluntary manslaughter to the jury.[6] *Commonwealth* v. *Mann,* 116 Mass. 58, 61 (1874). See *Commonwealth* v. *Young,* 326 Mass. 597, 601 (1950); *Commonwealth* v. *Baker,* 346 Mass. 107, 119

---

[6] We note that there was also an instruction on involuntary manslaughter, which was erroneous since there was no evidence at all on which it could be based. Cf. *Commonwealth* v. *Bouvier,* 316 Mass. at 495. However, neither party has discussed this in the briefs or in oral argument (see Rule 1:13 of the Appeals Court, 1 Mass. App. Ct. 889 [1972]), and there is nothing to indicate that it was specifically called to the trial judge's attention. The defendant's exception to the instructions on manslaughter was general and did not address itself to the portion on involuntary manslaughter, the only portion which was improper. See *Commonwealth* v. *Chapman,* 345 Mass. 251, 256 (1962); *Commonwealth* v. *Camelio,* 1 Mass. App. Ct. 296, 302-303 (1973). In the circumstances, the jury having found that the defendant did the shooting, we do not believe that "a substantial risk of a miscarriage of justice" (*Commonwealth* v. *Freeman,* 352 Mass. 556, 564 [1967]) is raised so as to impel us to reverse. *Commonwealth* v. *Camelio, supra,* at 303.

(1963); *Commonwealth* v. *Kendrick,* 351 Mass. at 213. See also *Commonwealth* v. *Campbell,* 352 Mass. at 392. Contrast *Commonwealth* v. *Hartford,* 346 Mass. 482, 490-491 (1963), and *Commonwealth* v. *Rembiszewski,* 363 Mass. at 311.

Our conclusion finds support in Am. Law Inst., Model Penal Code, § 1.07 (5) (Proposed Official Draft, 1962), cited in *Commonwealth* v. *McKay,* 363 Mass. 220, 228 (1973), and adopted in the Proposed Criminal Code of Massachusetts, c. 263, § 10 (e) (1972). In this latest version of the Model Penal Code, some discretion is given to a trial judge to charge any included offense. Subsection (5) reads: "The Court *shall not be obligated to* charge the jury with respect to an included offense unless there is a rational basis for a verdict acquitting the defendant of the offense charged and convicting him of the included offense" (emphasis supplied). The version in Tentative Draft No. 5 (1956) (there numbered § 1.08 [5]) did not include the words "be obligated to." The comment in the Proposed Official Draft, *supra,* at 13, states that "[t]he purpose of the change is to allow a court to submit an illogical included offense if the court believes that it is proper to do so." This version would also seem to go beyond the statement in the commentary to the Tentative Draft, *supra,* at 43: "The submission of an included crime is justified only where there is *some basis in the evidence* for finding the defendant innocent of the crime charged and yet guilty of the included crime" (emphasis supplied). This statement approximates the basis for our decision.[7] The other assignments of error do not require extended discussion.

---

[7] Other jurisdictions have adopted varying rules depending on their views of the respective roles of the judge and jury. See and compare, e.g. *Commonwealth* v. *Hoffman,* 439 Pa. 348, 356-357 (1970) ("[W]here the evidence would be sufficient to support a conviction of murder, the return of a verdict of voluntary manslaughter is strictly within the jury's prerogative even in the absence of provocation and passion."); *People* v. *Powell,* 34 Cal. 2d 196, 207 (1949) (permitting

2. The trial judge properly submitted to the jury the victim's declaration that the defendant had shot him. We need not repeat the circumstances under which Daniel, seriously wounded, named the defendant. (See fn. 1 and the text to which it is appended.) They are sufficiently like (and, in some respects, more persuasive than) the circumstances of the statement admitted as a dying declaration in *Commonwealth* v. *Dunker*, 363 Mass. 792, 794 (1973), so that the same result is required. The credibility of the declaration and the weight to be attached to it were for the jury. *Commonwealth* v. *Casey*, 11 Cush. 417, 421-422 (1853).

3. Also admissible was the testimony of a police officer that he had seen the defendant in the area of a particular nightclub about ten or twelve times in the three weeks prior to the shooting, but not thereafter. Other testimony had also placed the defendant in that vicinity at various times prior to the shooting, and the defendant's admission indicated that he was in the area when the shooting occurred. The evidence sufficiently pointed to a "location . . . where . . . [the defendant] may customarily resort" (*Commonwealth* v. *Carita*, 356 Mass. 132, 140 [1969]) so that a jury could infer flight from the

---

the fact finder, where no miscarriage of justice appears, "because of what technically may be extralegal considerations, such as mercy, [to] temper . . . the harsh application of the law . . ."); *State* v. *Wilson*, 182 Ore. 681, 684-685 (1948) ("[W]here the evidence is sufficient to raise a doubt, however slight, as to whether the homicide is one of two or more degrees, the court must charge on all such degrees.") applied in *State* v. *Blocher*, 10 Ore. App. 357, 360-361 (1972), to uphold a voluntary manslaughter charge over defendant's objection; *People* v. *Mussenden*, 308 N. Y. 558, 563 (1955) (the apparent source of the statement in the commentary in Tentative Draft No. 5, quoted in the text); *Sansone* v. *United States*, 380 U. S. 343, 350, fn. 6 (1965); *Keeble* v. *United States*, 412 U. S. at 208, 212-213; *Driscoll* v. *United States*, 356 F. 2d at 327; *United States* v. *Harary*, 457 F. 2d 471, 478 (2d Cir. 1972); Wright, Federal Practice and Procedure: Criminal, § 515, pp. 371-375 (1969). See generally Note, 14 So. Cal. L. Rev. 189 (1941); Note, Submission of Lesser Crimes, 56 Colum. L. Rev. 888 (1956).

defendant's absence from that area after the shooting. *Commonwealth* v. *Geagan,* 339 Mass. 487, 512 (1959), cert. den. 361 U. S. 895 (1959).

4. The defendant's argument for a directed verdict on the manslaughter charge attacks primarily the reliability and credibility of the dying declaration, discussed above. The statement of the deceased presented a jury question whether it was the defendant who had done the shooting, although the dying declaration was uncorroborated except peripherally. See *Commonwealth* v. *Kimball,* 321 Mass. 290, 293 (1947); *Commonwealth* v. *Fiore,* 364 Mass. 819, 822 (1974). See also *Commonwealth* v. *Carvalho,* 355 Mass. 783 (1968). It would serve no useful purpose further to repeat and summarize the evidence. There was also sufficient evidence to submit to the jury the charge of unlawfully carrying a firearm. G. L. c. 269, § 10. *Commonwealth* v. *McCambridge,* 351 Mass. 516, 522 (1967).

*Judgments affirmed.*